Present:  All the Justices

VIRGINIA POLYTECHNIC INSTITUTE
AND STATE UNIVERSITY, ET AL.

v.  Record No. 030965  OPINION BY JUSTICE CYNTHIA D. KINSER
                                        April 23, 2004
INTERACTIVE RETURN SERVICE, INC.

           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                      Theodore J. Markow, Judge


     The primary question in this appeal is whether a

reasonably prudent person in the position of the

contracting parties would have considered the type of

damages claimed in this case to be the natural consequence

of a breach of certain agreements dealing with the

assignment of intellectual property rights.  Answering that

question affirmatively, we conclude that the circuit court

did not err by admitting evidence of consequential damages.

We also conclude that the circuit court did not err in

instructing the jury on the issue of waiver.

                      PRIOR PROCEEDINGS

     Interactive Return Service, Inc. ("IRS"), filed a

breach of contract action against Virginia Polytechnic

Institute and State University ("Virginia Tech"), Virginia

Tech Intellectual Properties, Inc. ("VTIP"), and William

Landsidle, Comptroller.[1]  IRS sought damages against

Virginia Tech for its alleged breach of a sponsored

"Research Agreement" ("SRA") entered into between IRS and

Virginia Tech, and damages against both Virginia Tech and

VTIP for their alleged breach of an "Industry Project

Agreement" ("IPA") entered into between IRS, Virginia Tech,

VTIP and the Center for Innovative Technology ("CIT").  A

jury returned a verdict in favor of IRS against both

Virginia Tech and VTIP and fixed damages in the amount of

$110,000.  The circuit court entered judgment against

Virginia Tech and VTIP, jointly and severally, in that

amount.  Virginia Tech and VTIP (sometimes referred to as

"the defendants") along with Landsidle appeal from that

judgment.[2]

RELEVANT FACTS

The terms of the SRA entered into between Virginia

Tech and IRS in January 1995 provided that IRS would

---

[1] IRS sued Landsidle in his official capacity as Comptroller for the Commonwealth of Virginia pursuant to Code § 8.01-193.

[2] At the close of the plaintiff's evidence, Virginia Tech and VTIP moved to strike the evidence and enter judgment in their favor.  The trial court granted the motion with regard to IRS's claims for breach of an oral contract, inverse condemnation, and breach of an implied contract.  A claim for breach of the SRA and a separate claim for breach of the IPA remained in the case and were decided by the jury.

sponsor research at Virginia Tech to develop "an Interactive Response Unit for use with IRS' patent pending [for an] [I]nteractive and [V]ideo [D]ata [S]ervice [S]ystem." According to the SRA, "[t]he Interactive Response Unit . . . is a device that interprets a television transmitted audio signal and analyzes coordinates of a position on the television screen directed by a laser beam and transmits a signal to a local repeater station using IVDS (Interactive and Video Data Service)." The Interactive Response Unit supposedly allows a television viewer to interact with the television by purchasing an advertised product, responding to a polling question presented during a news program, or connecting to the "Internet."

Under the terms of the SRA, Virginia Tech was required to "make every effort[] to develop mass production engineering prototypes of the system . . . in compliance with the Federal Communications Commission['s] . . . rules for IVDS that will allow manufacturers to produce reliable products that are affordable to the general public and reliable products for the IVDS network providers." IRS agreed to reimburse Virginia Tech, on a monthly basis, for a portion of the costs of the research and development of the prototype. Virginia Tech was to submit monthly

3

billings to IRS for the costs that had been incurred in the performance of the SRA, and IRS was obligated to pay promptly 80 percent of the billings, with the remaining 20 percent to be paid after Virginia Tech delivered the prototype. Finally, Virginia Tech had "the right to cease to perform any additional effort upon written notice to IRS to that effect, only after a material breach of this agreement [had] occurred." In that event, Virginia Tech was required to produce "a final report describing the effort at such time as the effort ceased."

The SRA also addressed the ownership of inventions resulting from the research. The title and ownership of inventions resulting from research conceived solely by researchers at Virginia Tech would be assigned to CIT.[3] For inventions resulting from research conceived jointly by Virginia Tech researchers and IRS, title and ownership would reside jointly with IRS and CIT. Finally, inventions resulting from research conceived solely by IRS would be owned by IRS.

---

[3] At about the same time Virginia Tech and IRS entered into the SRA, IRS and CIT executed an agreement setting forth the terms under which CIT would license to IRS any inventions assigned to CIT by Virginia Tech pursuant to the SRA. This agreement, among other things, granted IRS the option to acquire an exclusive, worldwide license of the Interactive Response Unit.

Virginia Tech began the research in 1995. The research was supposed to be completed in nine months at a cost of $201,505, but Virginia Tech requested several work extensions and additional research costs. Although IRS agreed to these extensions and increased costs, IRS repeatedly advised Virginia Tech that it had no revenues and that its only source of cash was to sell "equity participation (IRS[] Shares) or by selling technology rights." According to IRS, its major assets were its proprietary technology and the relationship with Virginia Tech and CIT.

IRS paid Virginia Tech slightly more than $103,000. However, after December 1995, IRS did not make any further payments on the research costs owed to Virginia Tech under the SRA.[4] Virginia Tech sent several letters to IRS demanding payment of the unpaid costs. IRS never denied the indebtedness but responded by offering to work out a payment schedule that delayed payment of the past due amount until the research produced a working prototype. IRS also offered to pay interest on the unpaid balance. In approximately June 1996, IRS informed Virginia Tech that it could not make any further payments until it received the

---

[4] The last payment made in December 1995 was for the July 1995 billing.

finished product.  Nonetheless, IRS admitted at trial that it owed Virginia Tech approximately $750,000.[5]

During the same period of time, June 1996, IRS, Virginia Tech, VTIP, and CIT, entered into the IPA.  In that agreement, the parties acknowledged their desire that the technology related to the Interactive Video and Data Service System "be used in the public interest and be available to the public quickly and efficiently."  CIT agreed to "cost-share" the research project by providing $73,500 to Virginia Tech.  In return for CIT's funding, IRS agreed to repay CIT the amount of $147,000, double CIT's investment, out of "net revenues arising from the selling, leasing, licensing, sublicensing, or in any other manner generating revenue from the transfer or use of any products and/or services using" the technology related to the Interactive Video and Data Service System.  IRS also agreed to sponsor the research project at Virginia Tech by providing $416,131 to Virginia Tech.  Pursuant to the terms of the IPA, Virginia Tech was obligated to assign any "Discoveries . . . conceived, developed, or reduced to practice during the Term of the Research Program" to VTIP,

---

[5] Virginia Tech's records showed that it had billed IRS the cumulative amount of $678,745.01.

6

which would in turn "assign to CIT all intellectual property rights related to the Discover[ies]."[6]

After execution of the IPA, Virginia Tech requested additional extensions and cost increases for the research project, but IRS still did not make any payments to Virginia Tech. In a "Call/Visit Documentation" dated July 10, 1996, a contracts and grants administrator for the Virginia Tech Office of Sponsored Programs noted "as of" June 26, 1996 that "[s]ponsor [IRS] will not have money until he receives finished product and can sell it. He will pay us then. We are to keep invoicing him." According to IRS, Virginia Tech agreed in the fall of 1996 to continue the research project until a working prototype was developed and to give IRS 90 days thereafter to pay its indebtedness to Virginia Tech. In December 1996, Virginia Tech requested a "no-cost extension" of the research project to June 30, 1997.

However, soon after December 1996, Virginia Tech stopped working on the project. It did not deliver a final report to IRS as required by the SRA. In a July 1997 letter, Virginia Tech advised IRS that, in light of the

---

[6] Virginia Tech and VTIP did not have any different practices and procedures for dealing with inventions under a sponsored research agreement than for dealing with discoveries under an industry project agreement.

7

fact that the research results and intellectual property derived from the project remained with Virginia Tech, it would assign these rights to VTIP unless IRS's obligation was paid in full within 45 days. Virginia Tech further advised IRS that VTIP, upon receiving the assignment, intended to execute a license with Proceso Interactivo S. A. de C.V. ("PISA") and that the terms of that license would include an obligation by PISA to repay to Virginia Tech the outstanding indebtedness of IRS.[7]

IRS did not pay as requested. Consequently, in an August 1997 document titled "Virginia Tech Intellectual Property Disclosure," Virginia Tech captured the results of the research so that it could be licensed to PISA.[8] The type of work listed in the disclosure was "Interactive Video Data Service (IVDS) System," and the disclosure

---

[7] In an email message dated June 17, 1997, Virginia Tech indicated that it was proposing "to grant exclusive world wide rights for all of the work done at [Virginia] Tech (audio coding, circuit design and software) to PISA in return for a down stream license payment." Virginia Tech took the position that the audio coding, circuit design and software developed during the research project was intellectual property belonging to Virginia Tech, not IRS.

[8] Virginia Tech had previously prepared two other intellectual property disclosures with regard to the research project. In one of those documents, Virginia Tech acknowledged that IRS had "exclusive licensing options for use [of the intellectual property listed] in an interactive television application." All three intellectual property disclosures arose out of the research project but none were assigned to CIT.

stated that "the rights to use this technology will be assigned to PISA." Virginia Tech assigned the intellectual property and research results to VTIP, and one day later, VTIP licensed those rights to PISA. The intellectual property rights related to the research project were never assigned to CIT as required by the terms of both the SRA and the IPA.

In October 1997, IRS entered into an agreement with The HAGO Company, Inc. ("HAGO") for the sale and exclusive use of certain intellectual property rights in the United States of America. In the agreement, IRS stipulated that it had a research and development contract with Virginia Tech and that the ownership of the software and other results of that research were in dispute. Accordingly, HAGO agreed to pay IRS "a monthly payment equal to the greater amount between fifty US cents per each Audio-Link in operation and the minimum monthly amount" of $10,000. HAGO agreed to increase the minimum monthly amount to $60,000 "thirty days after [Virginia Tech] deliver[ed] the software and results of" the research and development project and "a letter of no action against" IRS or "thirty days after [a] final appealable order instruct[ed Virginia Tech] to deliver the software and results of" the research and development to IRS.

After executing the agreement with HAGO, IRS sent Virginia Tech a copy of the contract. About two months later, IRS presented a pecuniary claim against Virginia Tech, and this litigation followed.

ANALYSIS

Armed with a jury verdict approved by the circuit court, IRS holds "the most favored position known to the law." Stanley v. Webber, 260 Va. 90, 95, 531 S.E.2d 311, 314 (2000). On appeal, we view the evidence presented at trial in the light most favorable to the prevailing party, IRS, and we will not set aside the judgment of the circuit court unless it is plainly wrong or without evidence to support it. Id., Code § 8.01-680. Using these principles of appellate review, we turn now to the assignments of error presented in this appeal.

Virginia Tech and VTIP assign three errors to the circuit court's judgment. Initially, they assert that IRS was the first party to commit a material breach of "the contract" and that the circuit court, therefore, erred in overruling the defendants' motion to strike and Virginia Tech's motion to vacate the final order and enter summary

10

judgment in its favor.[9]  Next, Virginia Tech and VTIP

contend that the circuit court "erred by instructing the

jury on waiver and by denying [d]efendants' motion to

strike" and Virginia Tech's post-trial motion for summary

judgment because there was no "evidence that Virginia Tech

waived its right to payment under the contract."[10]  In the

third assignment of error, Virginia Tech and VTIP assert

that the circuit court "erred by admitting evidence of

consequential damages even though the evidence failed to

establish that those damages were within the contemplation

of the parties at the time of contracting."

In order to understand the posture of this case and to

address the first two assignments of error, we begin by

restating the questions presented to the jury for decision.

The circuit court instructed the jury that the issues in

the case were whether the SRA was a contract between IRS

and Virginia Tech, and if so, whether either party breached

it; and whether the IPA was a contract to which IRS,

Virginia Tech, and VTIP were parties, and if so, whether

any party breached it.  The jury was further instructed

---

[9] Only Virginia Tech filed a post-trial motion to vacate the final order and enter summary judgment in its favor.

[10] By its terms, the second assignment of error speaks only to Virginia Tech.

that it should find its verdict in favor of IRS and against Virginia Tech if it found that there was a contract between those parties; that IRS did not breach that contract, or if it did, Virginia Tech waived the breach; and that Virginia Tech breached the contract. The jury was similarly instructed with regard to VTIP. Based on these instructions, the jury necessarily concluded that VTIP breached the IPA since that was the only contract to which it was a party. However, given the general verdict form, it is impossible to know whether the jury concluded that Virginia Tech breached the SRA, the IPA, or both.

However, as IRS observes, the defendants' argument in the opening brief with regard to the first assignment of error addresses only the SRA. Virginia Tech and VTIP state that "[b]ecause it was undisputed that IRS committed the first material breach of the [Sponsored] Research Agreement, IRS was precluded as a matter of law from recovering for breach of the agreement." With regard to VTIP, it is irrelevant whether IRS was the first party to commit a material breach of the SRA because VTIP was not a party to that contract. As to Virginia Tech, it is not necessary to decide the merits of the first assignment of error because we conclude that the circuit court properly

12

instructed the jury with regard to the issue of waiver, which is the subject of the second assignment of error.

In that regard, Virginia Tech argues, and we agree, that it never waived the contractual right to be paid under both the SRA and the IPA. Even IRS acknowledged that fact by its admission at trial that it owed Virginia Tech approximately $750,000. Also, during closing argument, IRS suggested that the jury should reduce any award of damages to IRS by the amount of its indebtedness to Virginia Tech. The relevant question, however, was whether Virginia Tech waived its contractual right to timely payment by IRS, not whether Virginia Tech waived the right to all payment.

On the issue of waiver, the circuit court instructed the jury that "[a] waiver occurs when a party intentionally gives up a contractual right which would have been beneficial to it. A waiver may be expressly stated or it may be implied from conduct. A party cannot waive a right unless he has full knowledge of it." The court further instructed that "[t]he burden rests on a party claiming the other party has waived a right under a contract to prove the other party waived that [right] by clear, unequivocal, and convincing evidence, direct or implied." In addressing the defendants' objection to these instructions, the circuit court correctly stated, "The waiver question is did

13

they waive prompt payment.  Not payment but prompt payment."

"[W]aiver is an intentional relinquishment of a known right."  Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 74, 306 S.E.2d 870, 873 (1983).  Two elements are necessary to establish waiver: "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right."  Employers Commercial Union Ins. Co. of America v. Great American Ins. Co., 214 Va. 410, 412-13, 200 S.E.2d 560, 562 (1973); accord Horton v. Horton, 254 Va. 111, 117, 487 S.E.2d 200, 204 (1997); Stanley's Cafeteria, 226 Va. at 74, 306 S.E.2d at 873.  The party relying on a waiver has the burden "to prove the essentials of such waiver . . . by clear, precise and unequivocal evidence."  Utica Mut. Ins. Co. v. Nat'l Indem. Co., 210 Va. 769, 773, 173 S.E.2d 855, 858 (1970).

Virginia Tech clearly knew of its contractual right under the SRA to receive prompt payment from IRS of 80 percent of the research costs as billed on a monthly basis and its right to stop the research project if IRS materially breached its obligations under the SRA. Virginia Tech also was aware that, as of December 1995, IRS ceased making any payments on its indebtedness and that the December 1995 payment was for the July 1995 billing.  The

14

question here is whether Virginia Tech intended to relinquish its contractual right to receive prompt payment from IRS.

There is sufficient evidence to make that question a jury issue. From the beginning of the research project, IRS did not promptly pay the bills submitted by Virginia Tech and failed to make any payments after December 1995. Nevertheless, Virginia Tech continued to conduct research and requested several extensions and cost increases for the project. As early as August 1995, IRS informed Virginia Tech that its only sources of cash for the next few years would be by selling shares of stock in IRS and by selling technology rights. IRS's inability to pay until it received a working prototype was the subject of discussions and correspondence between IRS and Virginia Tech. A July 1996 internal Virginia Tech document acknowledged that fact, and according to IRS, Virginia Tech agreed in the fall of 1996 to give IRS 90 days after receipt of a working prototype to pay the indebtedness to Virginia Tech. As late as December 1996, Virginia Tech requested a no-cost extension of the research project. All this evidence is consistent with IRS's position that Virginia Tech had agreed to wait for payment until 90 days after it provided a working prototype to IRS.

15

This is not a case in which Virginia Tech merely acquiesced in IRS's failure to pay its indebtedness promptly. See Stanley's Cafeteria, 226 Va. at 74, 306 S.E.2d at 874 ("[a]cquiescence, that is, the failure to protest or object, is an element of waiver; but does not of itself constitute waiver"). Instead, there is sufficient evidence from which the jury could fairly infer that Virginia Tech intended to relinquish its contractual right to receive prompt payment by IRS in order to produce a working prototype. Rather than standing on its contractual rights and treating the SRA as ended, Virginia Tech, by its conduct, see Cocoa Products Co. of Am. v. Duche, 156 Va. 86, 96, 158 S.E. 719, 722 (1931) (contractual rights may be waived by course of dealing), kept the SRA alive for itself and for IRS, see Richmond Leather Mfg. Co. v. Fawcett, 130 Va. 484, 506-07, 107 S.E. 800, 808 (1921) ("series of dealings in which delayed deliveries are accepted and paid for, and further deliveries demanded, justifies the party in default in the absence of anything to the contrary, in concluding that the contract will not be rescinded on account of such delayed deliveries without notice," thereby "keep[ing] the contract alive").

Therefore, we conclude that the circuit court did not err in instructing the jury on the issue of waiver and in

refusing to grant the defendants' motion to strike and Virginia Tech's post-trial motion. That conclusion renders irrelevant the question whether IRS was the first party to commit a material breach of the SRA. Assuming the jury's verdict against Virginia Tech was based on its finding that Virginia Tech breached the SRA, not the IPA, the jury could have reached that verdict either by finding, per its instructions, that IRS did not breach the SRA, or that it did but Virginia Tech waived the breach. For that reason and because VTIP was not a party to the SRA, neither defendant can obtain any relief under the first assignment of error.

Virginia Tech and VTIP, nevertheless, argue in the reply brief that IRS was also the first party to commit a material breach of the IPA. They contend that the IPA did not alter IRS's obligation to pay Virginia Tech for the costs of the research project and that, under the terms of the IPA, IRS was required to sponsor the research by providing $416,131 to Virginia Tech. However, the terms of the IPA did not specify whether this sum reflected the balance owed to Virginia Tech at the time the parties entered into the IPA or whether it was additional money to be paid by IRS. Nor does the evidence in the record answer this question. Moreover, the IPA does not contain any

17

terms regarding when IRS was to pay that sum to Virginia Tech. Thus, the evidence at trial failed to demonstrate a material breach of the IPA by IRS.

Finally, with regard to the issue of consequential damages, Virginia Tech and VTIP argue that, when they contracted with IRS, they could not have contemplated that IRS would create an arrangement with a third party that tied royalty payments to IRS to its securing a final judgment against Virginia Tech. They also contend that the HAGO agreement was "a sham, nothing more than a thinly veiled attempt to manufacture consequential damages where no damages exist[ed]." Thus, according to the defendants, the circuit court erred in admitting evidence of consequential damages based on the HAGO agreement. We do not agree.

"Consequential damages are those which arise from the intervention of 'special circumstances' not ordinarily predictable." Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975); accord NAJLA Assocs., Inc. v. William L. Griffith & Co. of Va., Inc., 253 Va. 83, 86, 480 S.E.2d 492, 494 (1997). Consequential damages "are compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties." NAJLA

18

Assocs., 253 Va. at 87, 480 S.E.2d at 494. The term "contemplation" used in this context means both "what was actually foreseen and what was reasonably foreseeable." Roanoke Hosp., 215 Va. at 801 n. 4, 214 S.E.2d at 160 n. 4; accord Danburg v. Keil, 235 Va. 71, 76, 365 S.E.2d 754, 757 (1988). The question "[w]hether special circumstances were within the contemplation of the parties is a question of fact." Roanoke Hosp., 215 Va. at 801, 214 S.E.2d at 160.

We need look no further than the terms of the SRA and IPA to conclude that the evidence was sufficient to make the question whether the type of damages claimed by IRS was within the contemplation of the parties an issue for the jury to resolve. See Fairfax County Redevelopment & Housing Auth. v. Hurst & Assocs. Consulting Eng'rs, Inc., 231 Va. 164, 168, 343 S.E.2d 294, 296 (1986). Under the terms of the SRA, Virginia Tech was obligated to "make every effort[] to develop mass production engineering prototypes of the system . . . that will allow manufacturers to produce reliable products that are affordable to the general public and reliable products for the IVDS network providers." The introductory section of the IPA, which both Virginia Tech and VTIP executed, stated that IRS had "an interest in developing and commercializing technology related to [the] Interactive Video and Data

19

Service System."  In that same section, the parties to the agreement expressed their desire that such technology be made available to the public, and CIT stated its interest in helping IRS commercialize the technology.  In return for CIT's "cost-share funding" to Virginia Tech, IRS agreed to repay CIT from its worldwide "net revenues arising from the selling, leasing, licensing, sublicensing, or in any other manner generating revenue from the transfer or use of any products and/or services using" the technology developed in the research program by Virginia Tech.  In turn, CIT was required to distribute to Virginia Tech a proportional share of each payment received from IRS.

Based on the provisions of the SRA and the IPA, it was reasonably foreseeable to the parties that, following research and the development of intellectual property and technology related to the Interactive Video and Data Service System, there would be licensing, manufacturing, and/or marketing contracts for those rights and that such contracts would generate revenues to IRS.  IRS's agreement to sell intellectual property rights to HAGO was such a contract.  Thus, the consequential damages claimed by IRS were of the nature and type of damages within the contemplation of the parties, i.e., reasonably foreseeable, at the time of contracting.  See Krauss v. Greenbarg, 137

20

F.2d 569, 570-71 (3rd Cir. 1943) (in Pennsylvania, the determinative question is whether the breaching party knew that the breach would probably result in the kind of special damages claimed).  Stated differently, a reasonably prudent person in the position of Virginia Tech and VTIP at the time of contracting would have considered this type of damages to be the natural consequence of their breach of the SRA and/or the IPA when they failed to assign the intellectual property rights to CIT so those rights could be licensed to IRS.  See Contempo Design, Inc. v. Chicago & Northeast Ill. Dist. Council of Carpenters, 226 F.3d 535, 554 (7th Cir. 2000), cert. denied, 531 U.S. 1078 (2001).

It was not necessary for the parties actually to foresee that type of consequential damages.  See Roanoke Hosp., 215 Va. at 801 n. 4, 214 S.E.2d at 160 n. 4; see also Passaic Distrib., Inc. v. The Sherman Co., 386 F. Supp. 647, 651 (S.D.N.Y. 1974) (applying New Jersey law, "[a]ctual foresight of the specific injury of a particular amount in money is not required").  Neither was it necessary that the HAGO agreement in particular or the exact consequential damages claimed by IRS be in fact foreseen or reasonably foreseeable by the parties.[11]  See

_____

[11] To the extent that Virginia Tech and VTIP argue that the quantum of consequential damages claimed by IRS was

21

Sabraw v. Kaplan, 211 Cal. App. 2d 224, 228 (Cal. Ct. App. 1962) ("it is not necessary that the exact manner by which damages occur by reason of breach of contract be foreseeable"); Stern & Stern Assocs. v. Timmons, 423 S.E.2d 124, 125 (S.C. 1992) ("the defendant need not foresee the exact dollar amount of the injury, the defendant [need only] know or have reason to know the special circumstances"). Accordingly, the circuit court did not err in admitting evidence of consequential damages. There was sufficient evidence of special circumstances within the contemplation of the parties to submit this factual issue to the jury and to sustain the jury's verdict.

## CONCLUSION

In summary, there is sufficient evidence from which the jury could have concluded that Virginia Tech waived its contractual right to receive prompt payment from IRS. Thus, the circuit court did not err by instructing the jury on the issue of waiver. Consequently, it is irrelevant whether IRS was the first party to commit a material breach of the SRA. And, there is no evidence that IRS was the first party to commit a material breach of the IPA.

---

speculative or that the HAGO agreement was entered into for fraudulent purposes, those arguments are not encompassed within the assignment of error. See Rule 5:17(c). We note that the defendants asserted those particular arguments in their motion in limine before the circuit court.

22

Finally, the evidence demonstrated that special circumstances giving rise to the type of consequential damages claimed by IRS were within the contemplation of the parties at the time of contracting.  For these reasons, we will affirm the judgment of the circuit court.

Affirmed.