## CIRCUIT COURT OF THE CITY OF ROANOKE

Peter F. Dawyot

    v.

Catawba Capital Management, Inc.

April 28, 2011

Case No. CL08002104-00

By Judge Charles N. Dorsey

For the reasons that follow, the defendant's motion *in limine* to exclude certain evidence is denied; the reciprocal motions for summary judgment are denied; the defendant's motion to strike the plaintiff's evidence is denied; and palpable error being found as to the valuation in this matter, this matter is continued for such further proceedings as the parties may be advised.

*Facts*

Along with four of his colleagues, the plaintiff, Peter F. Dawyot, left Dominion Bankshares and formed Catawba Capital Management, Inc., in 1992. Catawba is a registered investment advisory firm. This venture was

largely capitalized by a loan from a financier, Hubert Hoffman, Jr., who later passed away.

At the time of trial, there were four shareholders. There was the plaintiff, Dawyot, Hoffman's estate, Terence H. Crowgey, and R. Jay Irons. Catawba has always been an S corporation with only one class of common stock, and the shareholders have equal holdings so that each has a 25% interest of shares outstanding. In 1997, Catawba and four of the then five shareholders entered into what is titled a Redemption Agreement, defining, among other things, how to handle the disability of a shareholder, including the sale and purchase of his corporate stock. For the purposes of this opinion, this document, plaintiff's exhibit number 1, will be referred to as the "Redemption Agreement" without drawing any legal conclusions from that title. The Redemption Agreement was signed by the three living principals, and a former principal who has now withdrawn. Hoffman never signed the Redemption Agreement.

Dawyot subsequently suffered two strokes in 2006 and resigned as President of Catawba in 2007.

There is no question that Dawyot's disability left him unable to work as an investment advisor and that, consequently, the disability provisions of the Redemption Agreement were properly triggered. Further, there is no issue that Dawyot is owed a sum from Catawba. Dawyot has tendered his stock in the corporation pursuant to the terms of the Redemption Agreement, but, after extensive negotiations, the parties have been unable to agree on a price. Dawyot sues for the price of his tendered shares, the purchase of his life insurance policy pursuant to § 8 of the Redemption Agreement and his pro rata portion of anticipated tax liability on his proportionate share of Catawba's income pursuant to § 14 of the Redemption Agreement. The latter two claims are comparatively easily disposed of, and the primary issue in this litigation is the establishment of the price for the purchase of Dawyot's interest in the business.

In accord with the terms of the Redemption Agreement, Dawyot and Catawba selected an independent appraiser to determine Catawba's fair market value. While there has been much evidence and argument pertaining to the precise mechanics of how the independent appraiser was selected, there is no question that he was selected pursuant to the agreement and without objection, at least at the time, by either party.

In the fall of 2008, Z. Christopher Mercer, the appraiser the parties selected, finished his appraisal. In his final report, Mercer found that Catawba's fair market value was $3.47 million, meaning that Dawyot's 25% interest in the corporation was worth $867,500.00. Dawyot was essentially willing to accept this valuation, but Catawba was not. Dawyot alleges that, under the terms of the agreement, the Mercer Report's appraised value is "binding and conclusive." Catawba contends that Mercer made numerous

erroneous assumptions that, in turn, caused his opinion of Catawba's fair market value to be unreasonably high.

Prior to trial, both parties filed motions for summary judgment. The Court took the motions under advisement. The defendant then moved *in limine* to prevent plaintiff from introducing the Mercer Report without Mr. Mercer being personally present. The motion *in limine* was essentially predicated on hearsay objections. That motion was also taken under advisement pending trial. At the conclusion of the plaintiff's evidence and again at the conclusion of all the evidence, the defendant moved to strike the plaintiff's evidence, which motion was also taken under advisement.

Intending no oversimplification of counsels' sophisticated and nuanced arguments as to these motions for summary judgment, Catawba essentially contends that it is entitled to summary judgment because the so called Redemption Agreement is actually a shareholders agreement under Virginia Code § 13.1-671.1 and is subject to all of that section's requirements, including the fact that it must be signed by all shareholders, which it concededly was not. Similarly, as to summary judgment, Dawyot contends that the Redemption Agreement is a simple buy/sell agreement, not a shareholders agreement, and is enforceable by its terms including the agreed upon method of determining a price through an independent appraiser as was done in this case. In the alternative, Dawyot contends that, even if the agreement is a shareholders agreement that violates Virginia Code § 13.1-671.1, it is nonetheless enforceable because the General Assembly did not intend for that section to render contracts void.

The defendant's motion to strike at the conclusion of the plaintiff's evidence and again at the conclusion of all the evidence was again basically predicated on its motion for summary judgment along with the additional basis that, at trial, Dawyot admitted into evidence the Mercer Report without Mr. Mercer being present and testifying. The value contained in the report was admitted, over Catawba's hearsay objection. The balance of the report was received solely for the purpose of any cross-examination or argument by either side.

Consequently, while the procedural aspects are clear to counsel and the Court, the substantive legal issues are basically three, which are interwoven throughout the motions and trial.

*Issues*

(1) Is the Redemption Agreement subject to Virginia Code § 13.1-671.1 pertaining to shareholders agreements, and, if so, is it void for failing to comply with the requirements of that statute?

(2) Was the value contained in the Mercer Report improperly admitted into evidence, over the hearsay objection of the defendant, when Mr. Mercer was not present to testify?

(3) Should the Mercer Report be found invalid for palpable error?

*Analysis*

A. *Validity of the Redemption Agreement*

(1) *Compliance with Virginia Code § 13.1-671.1*

(a) *General*

Catawba claims that the Redemption Agreement is a shareholders agreement under Virginia Code § 13.1-671.1 and thus is subject to all the requirements of that section. Catawba argues that the agreement is so subject because it (1) alters corporate management and governance, (2) calls for the exercise of corporate powers, (3) provides for an unauthorized shareholders' meeting, and (4) requires the sale of corporate assets outside the regular course of business.

In response, Dawyot contends that the Redemption Agreement is a buy/sell agreement, not a shareholders agreement, and consequently not subject to the requirements of Virginia Code § 13.1-671.1.

By its plain terms, Virginia Code § 13.1-671.1 renders "[a]n agreement *among the shareholders* of a corporation . . . effective among the shareholders and the corporation." Va. Code § 13.1-671.1(A) (2011) (emphasis added). The agreement in this case is not among the shareholders but rather between most of the shareholders and the corporation. The Redemption Agreement is governed by Virginia Code § 13.1-649, which provides "[t]hat articles of incorporation, bylaws, and agreement among shareholders, *or an agreement between shareholders and the corporation* may impose restrictions on the transfer or registration of transfer of shares to the corporation." *Id.*, Va. Code § 13.1-649(A) (2011) (emphasis added). ("The starting point in statutory interpretation is the language of the statute itself. . . . [T]he legislative purpose is expressed by the ordinary meaning of the words used." *Ardestani v. INS*, 502 U.S. 129, 112 S. Ct. 515, 116 L. Ed. 2d 496 (1991) (citations omitted). "*Between* expresses one-to-one relations of many things, and *among* expresses collective and undefined relations." Bryan A. Garner, *Modern American Usage*, 99 (2d ed. 2003)).

Catawba also argues the Redemption Agreement is invalid because it was not signed by all shareholders as required under Virginia Code § 13.1-671.1. As discussed above, the agreement is not a shareholders' agreement within the meaning of Virginia Code § 13.1-671.1 and consequently is not subject to the unanimity requirement set out therein. Alternatively, even if the Redemption Agreement were subject to the unanimity requirement of the code section, it would not be void for failing to comply with that requirement, it would only be subject to the other provisions. *See Barber v. VistaRMS,*

*Inc.*, 272 Va. 319, 332, 634 S.E.2d 706, 714 (2006) (acknowledging that a shareholders' agreement is subject to all of the provisions of the Virginia Stock Corporation Act unless it complies with the requirements of Virginia Code § 13.1-671.1).

### (b) *Consistency with Virginia Stock Corporation Act*

Similarly, as discussed below, the agreement need not comply with the requirements of Virginia Code § 13.1-671.1 because the agreement does not conflict with any of the other provisions of the Virginia Stock Corporation Act. Va. Code §§ 13.1-601 through 779 (2011).

Code § 13.1-671.1, in pertinent part, provides:

A. An agreement among the shareholders of a corporation that complies with this section is effective among the shareholders and the corporation, even though it is inconsistent with one or more other provisions of this chapter in that it:

1. Eliminates the board of directors or . . . restricts the discretion or powers of the board of directors. . . .

2. Governs the authorization or making of distributions, whether or not in proportion to ownership of shares, subject to the limitations in § 13.1-653. . . .

4. Governs, in general or in regard to specific matters, the exercise or division of voting power by or between the shareholders and directors or by or among any of them, including use of weighted voting rights or director proxies;

5. Establishes the terms and conditions of any agreement for the transfer or use of property or the provision of services between the corporation and any shareholder, director, officer, or employee of the corporation, or among any of them. . . .

8. Otherwise governs the exercise of the corporate powers or management of the business and affairs of the corporation or the relationship among the shareholders, the directors, and the corporation, or among any of them, and is not contrary to public policy.

B. An agreement authorized by this section shall be:

1.    a. Set forth in the articles of incorporation or bylaws and approved by all persons who are shareholders at the time of the agreement; or

b. Set forth in a written agreement that is signed by all persons who are shareholders at the time of the agreement.

Va. Code § 13.1-671.1.

The purpose of this code section is to provide a safe harbor for agreements entered into by shareholders that are inconsistent with the background provisions of the Stock Corporation Act. This section is based on § 7.32 of the Model Business Corporation Act that has nearly identical wording. In the official comments to § 7.32, it states that:

> If an agreement is not in conflict with another section of the Model Act, no resort need be made to § 7.32, with its requirement of unanimity. For example, special provisions can be included in the articles of incorporation or bylaws with less than unanimous shareholder agreement so long as such provisions are not in conflict with other provisions of the [Model] Act. Similarly, § 7.32 would not have to be relied upon to validate typical buy/sell agreements among two or more shareholders or the covenants in other terms of a stock purchase agreement entered into in connection with the issuance of shares by a corporation.

Model Bus. Corp. Act § 7.32 (1984).

Consequently, so long as the agreement is consistent with the other provisions of the Virginia Stock Corporation Act, it need not comply with the requirement of Virginia Code § 13.1-671.1 regarding unanimity of shareholders.

In that regard, Catawba goes on to claim that the agreement is, in fact, inconsistent with several of the provisions of the Virginia Stock Corporation Act. These claims essentially are three. Catawba first argues that §§ 1, 2, and 14 of the Redemption Agreement violate Virginia Code § 13.1-673(B), which states that "[a]ll corporate powers shall be exercised by or under the authority of, and the business affairs of the corporation managed under the direction of, its board of directors, subject to any limitations set forth in the articles of incorporation or an agreement authorized under Virginia Code § 13.1-671.1." Va. Code § 13.1-673(B) (2011). Within the Redemption Agreement, § 1, governs the sale of a shareholder's stock to the corporation; § 2 provides that the corporation must buy a shareholder's stock within ninety days from withdrawal; and § 14 mandates that no party will allow the corporation's subchapter S election to terminate and that the corporation will distribute to each signing shareholder an amount of cash equal to his tax liability. These sections do not violate Virginia Code § 13.1-673(B) because, as Dawyot contends, "the signing shareholders are not purporting to bind the board; Catawba itself signed the agreement." Pl.'s Br. in Opp'n 8.

Secondly, Catawba claims that § 7 of the Redemption Agreement violates Virginia Code §§ 13.1-658 and 13.1-662. The former code section provides that "[a] corporation shall notify shareholders of the date, time,

and place of each annual and special shareholders meeting." Va. Code § 13.1-658(A) (2011). The latter code section states that, "unless the articles of incorporation provide otherwise, each outstanding share, regardless of class, is entitled to one vote on each matter voted on at a shareholders' meeting." *Id.* Va. Code § 13.1-662(A) (2011).

In pertinent part, § 7 of the Redemption Agreement states that:

> If the Corporation does not have sufficient earned and capital surplus to permit it lawfully to purchase all shares of capital stock which it is obligated to purchase hereunder, the Shareholders (including a deceased Shareholder's personal representative) shall promptly vote to reduce the capital of the Corporation or take such other steps including, for example, obtaining of a current appraisal of the assets of the Corporation, as may be appropriate and necessary to enable the Corporation lawfully to purchase and pay for all the shares to be purchased.

Catawba contends that § 7 of the Redemption Agreement violates Virginia Code §§ 13.1-658 and 13.1-662 because that section would create a shareholders' meeting among only four of the five shareholders depriving one shareholder of his vote on the matter. Dawyot responds essentially on two levels. First, he argues that § 7 of the Redemption Agreement is a nullity due to the fact that the concepts of earned and capital surplus are no longer employed but rather the insolvency tests of Virginia Code § 13.1-653. Secondly, in the alternative, Dawyot argues that § 7 of the Redemption Agreement constitutes a voting agreement under Virginia Code § 13.1-671 rather than a shareholders' agreement under Virginia Code § 13.1-671.1.

As to this argument, Dawyot is correct. Distributions to shareholders must comply with Virginia Code § 13.1-653. That section provides that a corporation cannot make distributions to shareholders if such distributions would prevent a corporation from being able to pay its debts as they became due or if its total assets would be less than its total liabilities. Consequently, for Catawba to lawfully purchase Dawyot's stock, it must comply with Virginia Code § 13.1-653 rather than the scheme set forth in § 7 of the Redemption Agreement.

Additionally, there is nothing contained in § 7 of the Redemption Agreement that mandates that a shareholders' meeting be held only among the shareholders who signed the agreement or that would deprive a non-signing shareholder of his vote on the matter of stock redemption. As previously stated, § 7 of the agreement merely requires that the signing shareholders will vote their shares a certain way. This constitutes a voting agreement under Virginia Code § 13.1-671.

Third, Catawba also claims that § 8 of the Redemption Agreement violates Virginia Code § 13.1-724. In pertinent part, Virginia Code § 13.1-724 states:

> A sale, lease, exchange, or other disposition of the corporation's assets . . . requires approval of the corporation's shareholders if the disposition would leave the corporation without a significant continuing business activity.

Va. Code § 13.1-724(A) (2011).

Section 8 of the Redemption Agreement provides that a selling shareholder may, within ninety days of his withdrawal, purchase any insurance policy on his life owned and carried by the corporation. Catawba maintains that this would constitute a sale of corporate assets outside of the regular course of business and therefore is subject to shareholder approval under Virginia Code § 13.1-724. Dawyot maintains that shareholder approval under Virginia Code § 13.1-724 is required only when the asset sale "would leave the corporation without a significant continuing business activity." Pl.'s Br. in Opp'n 8.

Again, Dawyot is correct. While it is true that the sale of corporately owned insurance policies is outside Catawba's regular course of business, such a sale would not "leave the corporation without a significant continuing business activity." Va. Code § 13.1-724(A). Consequently, the sale of insurance policies to the signing shareholders would not require shareholder approval under Virginia Code § 13.1-724.

### (2) *Waiver*

Additionally, and in the alternative, Catawba has waived its right to object to the validity of the Redemption Agreement. The Redemption Agreement had been executed for more than a decade; almost two years had elapsed since the plaintiff suffered his second stroke; and Catawba had hired its own expert for valuation and then subsequently agreed to engage Mercer Capital, pursuant to the Redemption Agreement, to perform an appraisal, before any objection was raised to the Redemption Agreement.

Waiver arises from the intentional relinquishment of a known right. *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 611 S.E.2d 600 (2005). All of these persons are sophisticated business people with much claimed experience in financial management. They were all aware of the Redemption Agreement and the terms of the Redemption Agreement. They clearly had knowledge of the facts basic to the exercise of the right, and they had the intent to relinquish the right, which are the two elements necessary to establish waiver. *Virginia Tech v. Interactive Return Serv., Inc.*, 267 Va. 642, 595 S.E.2d 1 (2004). Implied waiver must be established by

clear and convincing evidence which has been done here. Catawba cannot participate in the appraisal process pursuant to the Redemption Agreement and then lie in wait to see whether the valuation figure is acceptable before deciding whether to challenge the underlying Redemption Agreement. This sort of procedure has been renounced by other courts. *See, Oakwood Mobile Homes, Inc. v. Stevens*, 204 F. Supp. 2d 947, 952 (S.D. W. Va. 2002) (stating that a party cannot "hold back, await the outcome of the arbitration, and then blithely render it null simply by challenging the validity of the proceedings." (citations omitted)).

As the Redemption Agreement does not violate any of the background provisions of the Virginia Stock Corporation Act, it need not comply with the requirements of Virginia Code § 13.1-671.1. As it is not a shareholder's agreement, it need not comply with the provisions of Virginia Code § 13.1-671.1. Alternatively, Catawba has waived any right to contest the validity of the Redemption Agreement. As a result of all of these reasons, the Redemption Agreement is valid and enforceable against Catawba.

B. *Hearsay Objection to Admission into Evidence of the Mercer Report*

The Mercer Report was admitted into evidence over Catawba's hearsay objection. As previously stated, Catawba had also moved *in limine* to exclude introduction of the report without Mr. Mercer being present to testify. Mr. Mercer, in fact, never testified nor appeared at any portion of the trial.

The parties take clearly disparate views on the characterization of the Mercer Report. Catawba contends that "the opinions expressed by Mercer in the report are classic hearsay." Def.'s Post-trial Mem. 15. Dawyot, conversely, takes the view that "the Mercer Report itself is not hearsay." Pl.'s Post-trial Br. 39.

Virginia defines hearsay as "a spoken or written out-of-court declaration or non-verbal assertion offered in court to prove the truth of the matter asserted therein." *Arnold v. Commonwealth*, 4 Va. App. 275, 279-80, 356 S.E.2d 847, 850 (1987). Virginia law excludes from hearsay statements that create legal consequences, also known as "verbal acts." *Hamm v. Commonwealth*, 16 Va. App. 150, 156, 428 S.E.2d 517, 521 (1993); *see also McDonald v. National Enters.*, 262 Va. 184, 194, 547 S.E.2d 204, 210 (2001) (holding that a document titled "Bill of Sale and Assignment of Loans" was not hearsay because "[i]t was not offered for the `truth' of its averments, but for its legal affect.") (citations omitted). A contract for example, "is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992) (citing Kenneth S. Broun, 2 *McCormick on Evidence*, § 249, at 101); *see also Consol Rail Corp. v. Thomas*, 463 N.E.2d 315, 320 (Ind. App. 2004) ("This exclusion of `verbal acts' from the hearsay rule

obviously extends to a written contract offered in court not for the truth of any facts stated in it but to prove the existence of a contractual right or duty." (citation omitted)). Similarly, "evidence of lost profits based on a contract is not subject to the hearsay rule because such evidence concerns the existence of the contractual terms rather than an assertion of their 'truth'." *Mueller*, 972 F.2d at 937 (citing 6 John H. Wigmore, *Evidence in Trials at Common Law*, § 1770, at 259-60, n. 1).

In this case, the report was admitted solely for the value contained therein, which value had been determined by an agreed upon expert, pursuant to the contract of the parties. That value is a legally operative term of the contract, subject to determination of whether there is palpable error as will be addressed subsequently. The value contained in the report, which is the only portion of the report that was actually admitted into evidence, is not hearsay. The value contained in the report was a form of verbal act to which the law attached legal duties and liabilities. Since it was not offered for the truth of the matter asserted, i.e., it was not offered to prove Catawba's fair market value was $3.47 million dollars, but rather to prove the corporation's contractual obligation to purchase Dawyot's stock in accordance with Mercer's appraisal, it was not hearsay.

## C. *Palpable Error*

Both parties agree that the only real basis for setting aside the valuation of the Mercer Report is for a palpable error or mistake apparent on the face of the report. Both sides further agree that the governing law pertaining to this issue is contained in *Equitable Fire & Marine Ins. Co. v. Stieffens*, 154 Va. 281, 153 S.E. 731 (1930). It is also well-established that a palpable error that may be set aside by a trial court is one that is obvious and easily perceptible and of such a nature as to induce a belief that it proceeded from improper bias or from some gross misbehavior or inattention. *United Paperworkers' Int'l Union v. Chase Bag Co.*, 222 Va. 324, 281 S.E.2d 807 (1981). Errors of judgment, fairly exercised, do not constitute palpable mistakes. *Id.*

As previously noted, Mr. Mercer, the valuation expert selected by both parties, neither appeared nor testified in the trial of this matter. With regard to the expert testimony pertaining to the issue of palpable error, both Mr. Dawyot and also Mr. Crowgey, both of whom have served as President of Catawba and are money managers, testified slightly as to the Mercer Report but not as to the ultimate issue addressed here. The experts who attempted to testify as to palpable error were Harry Schwartz, Harold Martin, and Kesavan Iyer.

Mr. Schwartz is a C.P.A. accredited in business valuation by the American Society of Appraisers. He was admitted as an expert witness in the field of business appraisals and valuations without objection by the

plaintiff. While Mr. Schwartz reviewed the Mercer Report and analyzed it, he did not perform an appraisal of Catawba nor did he have an opinion as to the actual value of Catawba nor did he redo all of the calculations contained in the Mercer Report. (Trial, vol. III, 297.)

Harold G. Martin, Jr., also called by the defendant, is a certified public accountant who is accredited in business valuations by the American Institute of C.P.A.s and is also certified in financial forensics. Mr. Martin also holds the American Society of Appraisers' senior credential in business valuation. Mr. Martin also was admitted as an expert in business valuation without objection from the plaintiff. Mr. Martin had also conducted an appraisal of Catawba prior to Mr. Mercer's being retained by both parties. Mr. Martin had determined that the fair market of Mr. Dawyot's stock was $324,000.00. (Trial, vol. III, 386.) The two reports from Mr. Martin pertaining to that valuation identified an earlier error in Mr. Martin's valuation and corrected the value of Mr. Dawyot's stock from $268,000.00 to 324,000.00.

Kesavan Iyer is certified as a senior appraiser with the American Society of Appraisers and was also received as an expert in business valuations without any objection from the defendant. Mr. Iyer did not conduct an appraisal review but did informally review the Mercer Report. Mr. Iyer is neither a certified public accountant nor an economist. He also did not perform any appraisal of Catawba.

Essentially, the palpable errors in the Mercer Report claimed by Catawba are in three areas. First, in normalizing the earnings of the company, it is claimed that Mercer failed to take into account the benefits and federally mandated taxes. Secondly, it is claimed that Mercer used an incorrect beta, which is essentially a multiplier indicating the comparative risk of the business. Thirdly, Catawba claims that Mercer selected an inappropriately high growth rate for Catawba.

While all three experts were clearly experienced and knowledgeable in this area and counsel were likewise knowledgeable and well-prepared, the issue before the Court is not to come up with a "correct" valuation but merely to ascertain whether there is palpable error. To that end, the growth rate selected in the Mercer Report and the beta used may well be questionable from a professional valuator's perspective but could arguably fit outside the palpable error definition as the exercise of judgment.

The omission and inconsistent use of benefits and taxes in the normalization of earnings, however, is different.

All of the experts essentially agree that, as a threshold matter, it is important to normalize earnings to determine what expenditures should be included in, or excluded from, the valuation. At the time of the valuation, Catawba had three asset managers. Mr. Mercer determined that, based on industry standards, there should be five asset managers. He then used studies determining compensation for asset managers to set the compensation for

each of the five managers. He then adjusted the earnings of the company for the compensation paid to the managers. Defendant's Exhibit "Q" clearly sets out the palpable error of Mercer in normalizing these earnings. Because Catawba is an S corporation, shareholders are required to recognize certain fringe benefits as income while non-shareholders are not. (Trial, vol. III, 276.)

For the two new "fictional" managers that Mr. Mercer added to the existing three managers at Catawba, Mr. Mercer eliminated fringe benefits and did not make any allowance for payment of employer taxes. For the two stockholder managers previously employed by Catawba, Mr. Mercer eliminated fringe benefits but made allowance for payment of employer taxes. For the one non-stockholder portfolio manager already employed by Catawba, Mr. Mercer included both fringe benefits and payment of employer taxes. As urged by the defendant, the inconsistency in this treatment, in the absence of any testimony from Mercer, rules out the possibility that Mercer exercised fair judgment. See footnote 6 to defendant's post-trial memorandum for a more particularized statement, but the problem is conceptually clear and apparent even without particulars.

Since Mercer's initial report was reviewed before a final report was prepared, there is the obvious question of whether this issue was brought to Mercer's attention and, if so, and he failed to address it, would not that merely constitute an exercise of judgment? The problem again is that Mr. Mercer did not appear and did not testify. The issue was clearly brought to his attention before issuance of the final report. Consequently, the parties and the expert witnesses were left grasping at supposed assumptions and speculation as to what Mr. Mercer did or did not intend. For example, Mr. Schwartz on cross-examination when asked as to normalizing adjustments, "What is he doing?", answered "I do not know. I think there are some mathematical errors as I have stated." (Trial, vol. III, 316.) Mr. Schwartz goes on to testify as to the materiality of this mathematical error in that it artificially inflates the income of the company and consequently improperly increases the valuation of the company by approximately $2,000,000.00. Mr. Martin also agreed that this error resulted in an approximate swing of $2,000,000.00 in the valuation.

Mr. Martin also testified that the errors pertaining to compensation and fringe benefits would be apparent to any prudent businessman. (Trial, vol. III, 389.) Despite the fact that Mr. Martin was not aware of any professional misconduct by Mr. Mercer, Mr. Martin could not answer why most of his observations which were sent to Mr. Mercer were not addressed in the final report. (Trial, vol. III, 389-90.) Mr. Martin significantly testified that he believed Mr. Mercer made an error of omission. When Mr. Martin was then asked if Mr. Mercer failed to read what Mr. Martin had sent to him, Mr. Martin's response was, "I would be speculating if — I do not know." (Trial, vol. III, 391.)

Mr. Iyer, after testifying that discretionary expenses are at the discretion of the owner, agreed that taxes were not discretionary, despite the fact that they too had been omitted. (Trial, vol. III, 409.) Mr. Iyer went on to testify that taxes were not "explicitly" included in Mr. Mercer's report. (Trial, vol. III, 418.) When questioned as to what he meant by the term "explicitly," Mr. Iyer stated that Mr. Mercer "*probably* includes the required benefits *or* the taxes." (Trial, vol. III, 419 (emphasis added).) When specifically asked if Mr. Mercer had probably included the fringe benefits, Mr. Iyer responded "I do not know for sure." (Trial, vol. III, 419.) Mr. Iyer went on to respond that he does not believe it is for him to answer whether Mr. Mercer exercised bad judgment, that "maybe" Mr. Mercer included taxes in the number that he picked for overall compensation, that Mr. Iyer made "an assumption" that Mr. Mercer considered fringe benefits in his report, and that, if fringe benefits are not included, income is over-stated, as is the value of the company. (Trial, vol. III, 419-22.)

Mr. Iyer most pointedly identifies the problem when he was asked on redirect examination, "can you tell from the face of the Mercer Report that Mercer Capital did not consider fringe benefits?" Mr. Iyer had to respond that, "No, I cannot say that.", "[H]e does not say one way or the other. . . ." (Trial, vol. III, 436.)

Though either party could have called Mr. Mercer as a witness, neither party did. None of the experts could supply the missing explanation, if there is one, for Mr. Mercer's repeated failure to consistently include fringe benefits and taxes in his normalization of earnings. That error is on the face of the report and continued to be on the face of the report even after it was drawn to his attention. The error is material. The fact that the error is itself both inconsistent and unexplained leads to a reasonable inference that it is actually an error of omission due to gross inattention rather than a permissible assumption in the exercise of judgment. Consequently the Court finds that there is palpable error on the face of the Mercer Report.

## D. *Dawyot's Claim for Taxes*

The defendant in its post-trial memorandum on pages 12 and 23 correctly states the testimony and conclusion on this issue, and the Court finds in favor of the defendant on Dawyot's claim for taxes.

## E. *Life Insurance Policy*

Dawyot also requests, pursuant to § 8 of the Redemption Agreement, that he be permitted to purchase a life insurance policy that the corporation maintained on his life. While the defendant is technically correct that this option is not triggered until after the sale of the shares, Dawyot has tendered his shares, and the life insurance policy is to be purchased by him pursuant to the Redemption Agreement.

## Conclusion

Due to the validity of the redemption agreement, the concession and obvious fact that Dawyot is owed by Catawba, and the additional fact that the agreed upon appraiser's report has been found to be invalid due to palpable error on its face, the parties are granted leave to have Mr. Mercer prepare a further report, without palpable error, and then complete the transaction pursuant to that valuation and the Redemption Agreement. Dawyot's claim for taxes is denied for the reasons set forth, and final judgment is entered as to that issue. Dawyot's request for purchase of his life insurance policy pursuant to § 8 of the Redemption Agreement is granted, and final judgment is entered as to that issue.