### Richmond

BRUCE G. MURPHY, ET AL.

V.

NOLTE & COMPANY, INC.

September 9, 1983.

Record No. 801459.

Present: All the Justices.

*Robert J. Roskovich (Kerr and Roskovich,* on brief), for appellants.

*James R. McKenry (Rixey, Heilig & McKenry,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this real estate case, we have a claim by a broker against the sellers for a proportionate share of a sales commission based on an oral listing agreement. The statute of frauds has been raised as a defense. The sellers also attempt to limit the amount of the commission, if any is due.

Appellee Nolte & Company, Inc., the plaintiff below, sued appellants Bruce G. Murphy and Lou Ann Murphy, his wife, for $12,775 arising from the sale of the Murphy home in Virginia Beach for $365,000. Nolte alleged the sellers employed William M. "Bill" Murphy to sell the property, and that he contacted various real estate agents in the Virginia Beach area, including Nolte, to show the property to prospective buyers. Nolte further alleged that it began to seek buyers as the result of the sellers' offer made through their agent. It also asserted that Bill Murphy assured Nolte that "there would be a seven percent (7%) commission paid with a 50/50 split on the gross sales price"; 50 percent going to Murphy, and the balance to the broker who was able to find a purchaser ready, willing, and able to buy. Nolte alleged it produced such a purchaser who closed on the property, but the sellers have refused to pay the agreed commission.

At trial, the jury rendered a verdict in favor of Nolte for the amount claimed. The sellers appeal from the June 1980 judgment order entered on the verdict, and we have limited the appeal to consideration of the two subjects noted above.

Although there was conflict in the evidence on many of the facts, we will state the evidence in the light most favorable to Nolte, who is before us armed with a jury verdict approved by the trial judge.

In the Fall of 1976, Bruce G. Murphy and his wife decided to sell their home. Murphy, an attorney with experience in the practice of real estate law, decided to employ Bill Murphy, his father and a local real estate agent, to sell the property. The agent traded as "Murphy Realty Co.," and "Murphy Real Estate." The father and son, together with Lou Ann Murphy, who was in the title insurance business, drafted a flyer describing the premises. This flyer, postcards with a color photograph of the house, and the agent's business card were circulated by the father to numerous realtors in the area. The asking price first was $385,000; later it was increased to $395,000.

According to the jury's finding, the sellers and the father orally agreed there would be a seven percent commission due on the sales price with a 50/50 split of the commission between Murphy, the listing broker, and the ultimate selling broker. This commission arrangement was set forth in the flyers. Local real estate agents testified that the father repeatedly confirmed this arrangement to them while he was promoting the sale of the property.

The Murphys' version of the listing contract, not accepted by the jury, was that a "net listing" agreement was made orally. Under such an arrangement, a seller attempts to realize a fixed "net" amount from the sale. Here, if the house sold for the full asking price, there would be a seven percent commission on the sales price, with 50 percent paid to the father and 50 percent to the selling broker. But if the property sold for less than the asking price of $395,000, the reduction would be charged against the commission. For example, if the purchase price was $390,000, the commission of $27,650 on $395,000 would be reduced by $5,000 to $22,650. And if the premises sold for $367,350 ($395,000 less $27,650) or below, there would be no commission due.

In July of 1978, Patricia T. Dunthorn, an agent employed by Nolte, showed the property to Robert W. Hudgins and his wife, the eventual purchasers. During that month, Dunthorn submitted a written offer of $355,500 to the sellers on behalf of the Hudginses. The proposal called for "a commission on the sale price of the property at the rate of *7%, seven percent.*" The writing was delivered to Bill Murphy at his son's law office. The offer was not accepted.

Later, after the sellers and purchasers negotiated directly with each other, an attorney for Hudgins prepared a sales contract dated July 25, 1978, in the amount of $365,000. This agreement

was signed by the sellers, the purchasers, and Bill Murphy; it was not executed by Nolte. Subsequently, at a time unspecified in the evidence, a copy of the contract was sent to Nolte's office.

That final agreement, designating Nolte as an agent, imposed liability for the commission on the sellers. It provided: "The total sales commission to be paid to brokers herein shall be $5,000. to be divided equally between the participating brokers." Murphy, the seller, testified he inserted the commission figure in the contract "to compensate my father for the time that he had spent in the two year period . . . showing the house." He also testified: "And then, . . . I felt like I would make a gift to the other agent of $2,500.00" because she "only had a couple of hours involved in showing the house."

The sale was closed in January of 1979. The father received a commission of $2,500; Nolte refused to accept the tender of a like amount.

On appeal, the sellers argue the action is barred by § 11-2(6a) of the statute of frauds, enacted by the General Assembly (Acts 1976, ch. 157) subsequent to our decision in *Reich* v. *Kimnach*, 216 Va. 109, 216 S.E.2d 58 (1975). There, we held that the statute of frauds did not apply to an oral listing agreement between a seller and a broker because it was a contract for services and not a contract "for the sale of real estate" under Code § 11-2(6).

As pertinent here, § 11-2(6a) provides that no action shall be brought upon "any agreement or contract for services to be performed in the sale of real estate" by a real estate broker or a real estate salesman unless the promise, contract, agreement or assurance, "or some memorandum or note thereof, be in writing and signed by the party to be charged thereby, or his agent."

The sellers contend Nolte has failed to discharge its burden to produce a memorandum sufficient to avoid the bar of the statute of frauds. They say there was an oral listing agreement between them and the father. They argue that the only memorandum signed by the party to be charged with payment of the commission is the final contract of sale between the sellers and the Hudginses. That writing, they point out, provides for a commission of $5,000 to be divided equally between the brokers. They say such memorandum does not contain any of the elements of the alleged contract which is the basis of this suit. Therefore, the argument continues, the memorandum relied on "falls far short of that required

to take this case from within the purview of the Statute of Frauds." We do not agree.

The statute of frauds, procedural and remedial in nature, is concerned with the enforceability of a contract and not its validity. *T . . . v. T . . .,* 216 Va. 867, 871, 224 S.E.2d 148, 151 (1976). The statute will not be applied when the result is to cause a fraud or perpetrate a wrong, because the object of the statute is to prevent frauds. *Id. Accord H-B Partnership v. Wimmer,* 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979).

At the outset, we must focus precisely on just what contract is sought to be enforced. In the language of the statute of frauds, the pertinent contract is the agreement "for services to be performed in the sale of real estate." Stated differently, under the pleadings in this case it is the agreement between Nolte and the sellers, acting through the father, that is the subject of scrutiny.

A real estate listing agreement is defined as a contract "between an owner of real property and a real estate agent, whereby the agent agrees to secure a buyer or tenant for specific property at a certain price and terms in return for a fee or commission." Black's Law Dictionary 840 (5th ed. 1979). Thus the inquiry here is whether there is sufficient written evidence, signed by the sellers, authorizing Nolte to act as their agent to secure a buyer for the property at a specific price in return for a commission. Manifestly, there is.

The sales contract, executed by the sellers, evidences the grant of authority by the Murphys to the father. The writing not only recognizes that the father is empowered to act for the sellers to secure a buyer and to enlist participation of other brokers, it also acknowledges Nolte's contribution to the transaction. This evidence is found in several places in the contract of sale.

First, in the opening paragraph of the writing, Nolte and "Murphy Real Estate" are shown as "the Agents," after the parties to the sale are set forth. Second, the writing provides: "The Seller agrees to pay the Agent a commission on the sales price . . . ." Third, the document has a space designated for a signature of a Nolte official. Finally, an addendum to the contract, also executed by the sellers, provides that a "total sales commission" is to be paid "to brokers herein."

All of this written evidence contains the basic terms of the contract for services. It identifies the parties to that agreement, recognizes the authority of the father to act for the sellers to sell the

property as well as his power to list the property with other agents, acknowledges the participation of Nolte, identifies the property, states a firm price as well as the terms of sale, and provides that a commission will be paid to the brokers. Consequently, while the whole services agreement is not memorialized by the writing, nevertheless, the references in the sales contract are sufficient to remove the oral agreement from the operation of the statute of frauds. The law does not require that the whole contract be in writing to be enforced when, as here, the memorandum relied on contains the essential terms of the agreement. *Reynolds* v. *Dixon,* 187 Va. 101, 106, 46 S.E.2d 6, 8 (1948).

■ Alternatively, the sellers argue that the damages should be based on the amount set forth in the contract of sale and thus limited to $2,500. They say that if the sales contract is to be relied on by Nolte to take the case out of the statute of frauds, then "to be consistent" the damages should be fixed in accordance with the amount specified in that writing. We reject that contention.

Given the object of the statute of frauds, we refuse to employ it to perpetrate a wrong; such would be the result if Nolte is limited to recovery of the commission recited in the sales contract. On this subject, the following evidence is clear, either because the facts are undisputed or because of the jury's findings on conflicting facts.

All three Murphys are experienced in the real estate business; one is a real estate lawyer, the wife is involved in the title insurance business, and the father has been a real estate agent for over 30 years. The trio collaborated and prepared a flyer describing the property to be sold, publicizing the agent's compensation to be "7% Commission (50/50 split)." The father, authorized by oral agreement to seek a purchaser and to enlist other agents in the endeavor, communicated an unrestricted offer to numerous brokers including Nolte. Relying on the sellers' offer transmitted by the father, Nolte rendered services in good faith and became the efficient cause of procuring a buyer for the property. Subsequently, the amount of the commission arbitrarily was altered by the sellers to the prejudice of Nolte without its consent or knowledge.

Given these facts, it would be unconscionable to apply the statute of frauds to deny Nolte a commission based on a rate clearly shown by the evidence and determined by the jury to be seven percent of the sales price, to be shared equally between the bro-

kers. Adoption of the sellers' argument would lead to the very type of unfair result the statute is designed to prevent. *See Criterion Ins. Co.* v. *Fulgham,* 219 Va. 294, 300, 247 S.E.2d 404, 408 (1978). Consequently, we hold the trial court, under the circumstances of this case, properly refused to limit the amount of the commission to the figure stated in the sales contract.

For these reasons, the judgment below will be

*Affirmed.*