**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-1617

REMY HOLDINGS INTERNATIONAL, LLC,

Plaintiff – Appellant,

v.

FISHER AUTO PARTS, INC,

Defendant – Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg.  Elizabeth Kay Dillon, District Judge.  (5:19-cv-00021-EKD-JCH)

Argued:  October 25, 2023                     Decided:  January 3, 2024

Before AGEE, WYNN and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion in which Judge Wynn and Judge Richardson joined.

**ARGUED:**  David Wayne Hearn, SANDS ANDERSON, PC, Richmond, Virginia, for Appellant.  Matthew Allen Fitzgerald, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Matthew D. Green, Karissa T. Kaseorg, SANDS ANDERSON, PC, Richmond, Virginia, for Appellant.  Ryan D. Frei, Lyle D. Kossis, MCGUIREWOODS LLP, Richmond, Virginia, for Appellee.

AGEE, Circuit Judge:

This appeal centers on the relationship between a manufacturer and a distributor of rotating electrical parts—specifically, starters and alternators—and their disagreement as to who owned the "core value" of thousands of finished parts when their relationship ended.

For years, USA Industries ("USA") harmoniously sold automotive parts to Fisher Auto Parts, Inc. ("Fisher") pursuant to numerous agreements. Remy Holdings International, LLC ("Remy") then bought USA and continued the relationship with Fisher under USA's existing agreements as well as a few additional ones. In time, Remy began to struggle to meet its contractual obligations. Fisher complained and invoked certain contractually available penalties but continued the parties' relationship for over a year. Eventually, however, Fisher terminated the relationship and began working with a different manufacturer. As part of the new arrangement, Fisher sold all of Fisher's core inventory to that manufacturer. Contending that Fisher wrongfully terminated their agreement and Fisher's core inventory belonged to it, Remy brought this action, claiming breaches of contract, unjust enrichment, and conversion. Fisher filed a counterclaim for breach of contract due to Remy's poor performance.

Although the claims were disposed of at different procedural postures, all claims were resolved in Fisher's favor. The district court granted summary judgment to Fisher on Remy's breach of contract claims and unjust enrichment claim. It also granted summary judgment to Fisher, concluding that Remy was liable on Fisher's breach of contract claim. Remy's conversion claim and the damages determination for Fisher's breach of contract

2

claim then proceeded to trial. The jury returned a verdict in favor of Fisher on the conversion claim and awarded Fisher $1,816,277 in damages for its claim.

Remy timely appeals, challenging aspects of the district court's evidentiary, summary judgment, and trial decisions. For the following reasons, we affirm.

I.

A.

To understand the parties' disagreement, some general knowledge about the relevant industry is necessary.

Although a dead alternator or starter may be useless to the average car owner, manufacturers can utilize those finished parts to remanufacture new parts. So, generally, when an alternator or starter dies, the old part can be removed and returned to the manufacturer for reuse. Manufacturers encourage the distributors they work with to return their finished parts so that the manufacturers can benefit from the parts' reuse. This process saves the manufacturer money by reducing its material costs. In that vein, finished parts retain a "core value"—the value of the parts' reusable materials.

Ordinarily, manufacturers incentivize returning finished parts through various programs, two of which are relevant here. First, in a "regular core deposit program" the manufacturer includes a refundable core charge—equal to the value of the part's reusable materials—in the sales price of a new part. J.A. 2239. When a distributor returns the finished part to the manufacturer, the manufacturer refunds that cost to the distributor. Second, in a "one-for-one" program, the manufacturer does not charge the distributor for

3

the core value, but the distributor returns a finished part for every new part it receives. J.A. 3027. Because this give and take isn't always perfectly balanced, the parties keep track of how many new parts are sold to the distributor and how many finished parts the distributor returns and then periodically reconcile the difference. If a distributor "over-returns" (returns more finished parts than new parts it receives), the manufacturer credits the difference. If the distributor "under-returns" (returns fewer finished parts than new parts it receives), the distributor pays the difference.

B.

With this general knowledge of industry practice in mind, we can turn to the specific facts of this case. USA manufactured rotating electrical parts, specializing in alternators and starters. It contracted to sell those parts to Fisher, an automotive parts warehouse distributor that sells rotating electrical parts to auto repair businesses. In 1997, USA became Fisher's primary supplier of rotating electrical parts. At all relevant times, Frank Doria, a senior USA (and later Remy) executive, and Bo Fisher, Fisher's CEO, negotiated the agreements that governed USA and Fisher's relationship. Some of those agreements are at issue here and require further context.

From 1997 to 2004, USA and Fisher agreed to use the regular core deposit program to govern the return of core parts to USA. Consistent with that program, USA charged Fisher a core deposit for each part it sold to Fisher and USA refunded that deposit when Fisher returned the finished part.

But given the large scale of its orders, Fisher had difficulty paying the large core deposits up front as required under that arrangement. So, in 2005, USA and Fisher orally

4

negotiated a new "core policy," which was memorialized in an unsigned document created by Bo Fisher entitled "USA Core Policy." J.A. 235. The USA Core Policy provided that "USA would support the Fisher core devaluation program" through four "steps." J.A. 235. The first two steps created a one-for-one core value program for the parties to follow beginning on January 1, 2005. Under step one, Fisher would no longer be charged for a refundable core deposit and would instead return a finished part for every new part it received. Under step two, the parties agreed to "an accounting process whereby" they would "analyze the net core balance (net cores purchased less returned) for the year." J.A. 235. If Fisher over-returned, USA would credit the difference and if Fisher under-returned, it would pay USA the difference.

Rather than addressing future transactions, the last two steps sought to "devalue" Fisher's then-existing cores. The third step provided that Fisher's then-existing "core value would instantly go to zero." J.A. 235. To "compensate" Fisher for that loss in core value, USA agreed to pay Fisher for the value of its then-existing core inventory in 144 monthly payments so that "[t]he full core value will be issued back to Fisher over 12 years." J.A. 235. The fourth and last step—and the provision that is particularly relevant to this litigation—stated that "should Fisher change [its] supplier of domestic remanufactured electrical products, all core reimbursement payments from USA would cease with nothing more owed to Fisher. Fisher wouldn't have to repay USA for any core reimbursement payments received to date. *The net result is that the cores are wholly owned by Fisher at the end of this process*." J.A. 235 (emphasis added).

5

In 2012, USA and Fisher amended their agreement in a signed Letter of Understanding ("2012 LOU"). In relevant part, it noted that "USA is in the process of paying down Fisher cores and this multi-year effort will continue until Fisher cores are paid off." J.A. 450. The 2012 LOU then explained that the "Fisher core devaluation monies will be sped up. All outstanding core devaluation credits that are scheduled to take more than 36 months to pay off will be refigured and paid to Fisher in equal monthly payments over the next 36 months." J.A. 450. Next, the 2012 LOU provided that the agreement was "predicated upon USA keeping Fisher competitive in the marketplace in every way." J.A. 450. In addition, it noted that "[o]ther agreements exist between the parties and these shall continue" and nothing stated in this agreement "shall supplant, reduce or eliminate any currently-existing program between Fisher and USA other than the specific points addressed." J.A. 450. Lastly, it stated that if USA sold its business, then "all aspects of this contract and the current program shall continue forward." J.A. 450.

Two years later Remy acquired USA and became Fisher's supplier of rotating electrical parts.

In 2015, Remy submitted buying terms to the Auto Parts Services Group (the "APSG Terms"), a buying group in which Fisher participated.[1] Members of the buying group could agree to the APSG Terms to the extent each individually chose to do so. The

---

[1] Distributors form buying groups to "leverage their power to get better deals, better promotions," and the like. J.A. 2395. These groups invite manufacturers to propose sales terms to the entire group.

Fisher was originally a part of the Federated buying group, which then merged with another buying group to form the Auto Parts Services Group.

APSG Terms included a "core pricing" provision that outlined Remy's core programs. J.A. 120. One of those programs was a "core relief program," which provided that after six months Remy "will have taken 100% of [the distributor's] core investment onto [its] balance sheet." J.A. 120. Additionally, the APSG Terms included a clause that stated,

> [Remy's] buying program will be reviewed annually and analyzed for competitiveness. If The Group determines and documents that the market has shifted, resulting in an uncompetitive situation, [Remy] will work closely . . . to take corrective action. A time period of 60 days will be allocated for such measures. If, at the end of the allotted time, an agreement cannot be reached, The Group will be held harmless from this agreement.

J.A. 118. Finally, there was a performance guarantee in which Remy pledged a "93% or higher monthly order fill, or the customer will receive an additional 5% discount for the month's shortages." J.A. 122. There is no indication that Fisher agreed to these terms but, as will be discussed, the parties utilized at least one of the APSG Terms' provisions during their relationship.

Remy and Fisher subsequently executed their own Letter of Understanding (the "2015 LOU"), which stated that "REMY wishes to continue to fully support Fisher with all aspects of past Fisher/USA agreements and Letters of Understanding, except as specifically included in this [LOU]." J.A. 136. The 2015 LOU provided for certain pricing and payment terms. Notably, in detailing the pricing, it explained that "the current 9% Federated Rebate will remain ongoing for Fisher beyond the expiration of this contract," J.A. 136, seemingly referencing a particular APSG Terms provision. Additionally, the 2015 LOU provided that "[t]his letter of understanding is predicated upon REMY keeping Fisher competitive in the marketplace in every way" (the "Keep Competitive Clause"). J.A.

7

136. It elaborated that "Remy shall take best efforts to ensure that Remy provides competitive products to Fisher compared to similar competitive products sold under the same market conditions and if this doesn't occur in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advanced notice; in such case Fisher shall not owe REMY any additional monies." J.A. 136.

There are two other agreements relevant to this appeal—the KOI Agreement and the Hoffman Agreement—which both related to Remy supplying parts to other auto parts distribution companies that Fisher later acquired. The precise details of these agreements are not relevant; it suffices to know that both agreements provided that if either agreement was terminated early, Fisher would owe Remy a certain amount of money for each month remaining in the contractual period. J.A. 128; J.A. 131.

Remy and Fisher performed under the above discussed agreements for a period of time without issue. However, in 2017, Remy's performance of its obligations began to decline. In particular, Remy consistently failed to timely fill Fisher's purchase orders. Generally, manufacturers are expected to have an order-fill rate of 95% (Remy pledged 93% in the APSG Terms), meaning that the manufacturer timely fills 95% of the customer's order. But "between March 2017 and May 2018, Remy's monthly order-fill rate never rose above 80%," and was "consistently in the 60s and 70s." J.A. 265. Some individual order-fill rates were even in the 40s and 50s.

By September 2017, Fisher regularly began expressing concern about Remy's performance issues. For example, in one email to Doria, Bo Fisher stated that Remy's fill rate was "terrible," the situation was "embarrassing," and Fisher was "losing lots of sales"

8

as a result. J.A. 1150. And throughout this period, Fisher invoked the fill-rate penalty set out in the APSG Terms to demand that Remy give Fisher a 5% discount whenever it did not have a 93% or higher monthly order-fill rate. Consistent with that provision, between 2017 and 2018, Remy gave Fisher $196,001 in penalty discounts.

Despite Fisher's frustrations with Remy and its invocation of the penalty provision, Fisher continued placing new orders with Remy, including large seasonal orders. On at least one occasion it absolved Remy of a fill-rate penalty. For example, in January 2018, Fisher placed a seasonal order for over 39,000 parts—equivalent to a six-month supply under their normal orders. Anticipating filling issues, Remy requested an accommodation on the 5% fill-rate penalty and Fisher agreed not to invoke the penalty for that order.

In June 2018, however, Fisher notified Remy that it intended to end their relationship effective August 18, 2018—before the intended expiration of the KOI and Hoffman Agreements—due to Remy's performance issues. Around that time, Fisher entered into a supply agreement with a new manufacturer. As part of that agreement, Fisher calculated its core value inventory to be worth $6,904,039 and sold it to the new manufacturer for $6,500,000.

After their arrangement ended, Remy billed Fisher $6,198,767.28 for approximately 130,000 parts with core value that Remy alleged it had supplied to Fisher in 2017 and 2018

9

and for which Fisher had not paid a core charge or returned parts with core value.[2] Fisher denied that Remy owned its core inventory and refused to pay.

C.

As a result of Fisher's refusal to pay, Remy filed a complaint in the U.S. District Court for the Western District of Virginia.[3] Remy asserted three claims based on its contention that it owned Fisher's core inventory: breach of contract, unjust enrichment, and conversion. The breach of contract claim also alleged that Fisher owed Remy damages for terminating the KOI and Hoffman Agreements prematurely. Remy additionally brought a second breach of contract claim, contending that Fisher improperly terminated the parties' relationship. Fisher filed a counterclaim for breach of contract, asserting that Remy breached its duty to keep Fisher competitive.

After discovery, the parties filed various motions, including (1) Remy's motion to exclude the USA Core Policy from evidence as violating Virginia's statute of frauds regarding sales of goods over $500; (2) Fisher's motion for summary judgment on Remy's second breach of contract claim (improper termination of the relationship); (3) Remy's motion for summary judgment on its first breach of contract claim (ownership of the core value and KOI and Hoffman Agreements); and (4) Remy's motion to exclude one of Fisher's experts.

---

[2] Remy claims that it only desires the value of cores that were supplied to Fisher after the 2015 APSG Terms "became effective." Opening Br. 7.

[3] Because the parties are diverse in citizenship and Remy sought over $75,000, the district court had jurisdiction over these state law claims pursuant to 18 U.S.C. § 1332.

After a hearing on all the motions, the district court denied each of Remy's motions and granted Fisher's motion. *See Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, No. 5:19-cv-00021, 2022 WL 193742, at *1 (W.D. Va. Jan. 21, 2022).[4] On Remy's motion to exclude, the district court explained that the statute of frauds did not apply because the USA Core Policy did not involve a sale of goods and, even if it did, numerous exceptions to the statute of frauds applied in this case. *Id.* at *7–8.

Turning to the motions for summary judgment, the court granted Fisher's motion for summary judgment on Remy's breach of contract claim related to Fisher's allegedly wrongful termination of the parties' relationship because Remy conceded that Fisher had the right to terminate their relationship after Remy failed to keep Fisher competitive by failing to meet its 93% fill-rate pledge. *Id.* at *10; J.A. 1307–08. The district court then denied summary judgment to Remy on its breach of contract claim related to the ownership of core value and damages under the KOI and Hoffman Agreement because the 2015 LOU stated that if Remy did not keep Fisher competitive "in Fisher's opinion then Fisher can change suppliers and end this contract with as little as 60 days of advanced notice" and "in such case Fisher *shall not owe REMY any additional monies*," *Remy Holdings Int'l*, 2022 WL 193742, at *11 (citation omitted) (emphasis added), and there was ample evidence Remy failed to keep Fisher competitive. Lastly, the court denied Remy's motion to exclude certain expert testimony. *Id.* at *12.

---

[4] Given the numerous motions and various agreements related to each argument, we begin with an overview of the district court's decisions and give a more thorough explanation of each one in the context of Remy's specific arguments below.

11

In a subsequent decision, the district court granted Fisher leave to file a second motion for summary judgment due to a change in legal theories by Remy in its motion for summary judgment.[5] In that motion, Fisher argued it was entitled to summary judgment on Remy's breach of contract and unjust enrichment claims, which were based on Remy's alleged entitlement to the core value and damages under the KOI and Hoffman Agreements.

With regard to the breach of contract claim, Fisher asserted that, under the first material breach doctrine, Remy's failure to keep Fisher competitive precluded Fisher's liability under any of the parties' agreements. The district court granted Fisher's motion, rejecting Remy's argument that Fisher waived a first material breach defense. *Remy Holdings Int'l, LLC v. Fisher Auto Parts, Inc.*, No. 5:19-cv-00021, 2022 WL 571527, at *5 (W.D. Va. Feb. 25, 2022).

The district court also granted Fisher's motion as to the unjust enrichment claim. The court reasoned that Remy did not dispute Fisher's arguments regarding that claim and, in fact, conceded at a hearing on the motion that its claim could not be sustained in light of the express contractual agreements. *Id.*

Because the district court had determined that Remy failed to keep Fisher competitive in Fisher's second motion for summary judgment, it then granted summary

---

[5] In its complaint, Remy claimed that the APSG Terms governed Fisher's termination rights and Fisher failed to comply with those terms. However, at the summary judgement stage, Remy conceded the language in the 2015 LOU "control[led] Fisher's termination rights" and that its "complaint [was] no longer in line with Remy's current theory." J.A. 1301.

12

judgment to Fisher as to Remy's liability for Fisher's breach of contract claim as that claim was also based on Remy's failure to keep Fisher competitive.[6]

The parties proceeded to trial on Remy's conversion claim and to determine damages for Fisher's breach of contract claim. In addition to other evidence regarding core ownership, at least five USA/Remy employees testified indicating that they understood that Fisher owned its cores. Ultimately, the jury returned a verdict in favor of Fisher on Remy's conversion claim and awarded Fisher $1,816,277 on its breach of contract claim.[7]

Remy timely appeals, bringing five general challenges to the district court's decisions. First, Remy asserts that the district court erroneously concluded that the statute of frauds does not bar the admission of the USA Core Policy. Second, it contends that the district court incorrectly determined that Fisher had not waived its first material breach defense. Third, Remy argues that the district court should have revived its unjust enrichment claim after dismissing its breach of contract claim related to its alleged ownership of the core value and entitlement to damages under the KOI and Hoffman Agreements. Fourth, it posits that the district court erroneously admitted certain expert

---

[6] Though it is not clear if this aspect of the district court's decision is in the twenty-volume record, the parties do not dispute that it occurred. In fact, Remy does not appear to challenge this decision at all.

[7] During closing arguments, Fisher's counsel asserted that Fisher proved damages of $2,297,474. However, Fisher reduced its requested damages by $196,001 to reflect order-fill penalties Remy already paid and then by an additional $285,196 to account for money Fisher admitted it owed under the KOI and Hoffman agreements. After the reductions, Fisher requested $1,816,277, which is the amount the jury awarded.

13

testimony at trial. Finally, Remy maintains that the district court mistakenly failed to instruct the jury on equitable defenses.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. Because Remy's claims arise under Virginia law, we apply the applicable law of Virginia. *Whitmire v. S. Farm Bureau Life Ins. Co.*, 52 F.4th 153, 157 (4th Cir. 2022). Where necessary, we determine how the Supreme Court of Virginia would decide a particular issue. *Id.*

## II.

Remy first asserts that the district court erred by allowing into evidence the USA Core Policy and testimony about it because the statute of frauds prohibits reliance on certain unsigned writings.

Remy invokes two Virginia statutes to press its argument, one derived from the Uniform Commercial Code ("U.C.C.") and the other derived from the common law. Virginia's U.C.C. statute of frauds provides:

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Va. Code Ann. § 8.2-201(1). The common law, or "general," statute of frauds, now codified, provides in part that "unless a promise, contract, [or] agreement, . . . is in writing and signed by the party to be charged or his agent, no action shall be brought . . . [u]pon any agreement that is not to be performed within a year." *Id.* § 11-2(8).

14

Before trial, Remy argued that, as a contract for the sale of goods for $500 or more, the USA Core Policy failed to comply with the U.C.C. statute of frauds because it was not signed by USA or Remy. The district court rejected Remy's argument, explaining that the USA Core Policy "is not a contract for the sale of goods" but is instead an "outline of steps the parties would follow as part of the Fisher core devaluation program," and therefore is not subject to the statute of frauds. *Remy Holdings Int'l*, 2022 WL 193742, at *7 (cleaned up). Moreover, the district court found that even if it was subject to the statute of frauds, multiple exceptions to the enforcement of the statute of frauds applied. *Id.* at *8. For example, it concluded that the USA Core Policy was incorporated into the 2012 LOU and found that the merchant exception applied because USA never objected to the policy after receiving it from Fisher. *Id.* at *7–8.

Then, during trial, Remy argued that the USA Core Policy—and any testimony about it—was inadmissible as a violation of the general statute of frauds under Va. Code Ann. § 11-2(8). The district court overruled Remy's objection, "[f]or all the reasons previously stated" in its denial of Remy's original motion to exclude the USA Core Policy. J.A. 2785.

"We review a district court's evidentiary rulings for abuse of discretion and subject such rulings to harmless error review." *United States v. Johnson*, 587 F.3d 625, 637 (4th Cir. 2009).

We address the U.C.C. statute of frauds first. We note, as an initial matter, that there is a viable argument that the USA Core Policy does not involve a contract for the sale of

15

goods such that the U.C.C. statute of frauds would be inapplicable.[8] But we need not definitively decide whether the USA Core Policy involves the sale of goods under the U.C.C. statute of frauds. This is because, even if it does, the U.C.C. statute of frauds does not preclude the admission of the USA Core Policy. Most obviously, a separate writing "sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought" takes the USA Core Policy out of the U.C.C. statute of frauds. Va. Code Ann. § 8.2-201(1). Indeed, the signed 2012 LOU sufficiently references the USA Core Policy so as to satisfy this method of documenting the parties' consent to the unsigned agreement. The USA Core Policy, at its heart, created a "core devaluation program" in which USA paid Fisher in equal monthly installments for the full value of Fisher's then-existing cores. The 2012 LOU, signed by both parties, acknowledged that "USA is in the process of paying down Fisher cores and this multi-year effort will continue until Fisher cores are paid off." J.A. 450. It then explained that "Fisher core devaluation monies will be sped up. All outstanding core devaluation credits that are scheduled to take more than 36 months to pay off will be refigured and paid to Fisher in equal monthly payments over the next 36 months." J.A. 450.

The 2012 LOU leaves no doubt that a separate contract existed between USA and Fisher governing Fisher's core devaluation and it explains how the agreement worked—USA made equal monthly payments to Fisher for Fisher's core devaluation. Although Remy complains that the 2012 LOU did not specifically reference the USA Core Policy

---

[8] "A 'sale' consists in the passing of title from the seller to the buyer for a price." Va. Code Ann. § 8.2-106(1) (citation omitted).

16

provision most relevant to this case—the statement that, at the end of this process, Fisher would own its cores—there is no requirement that the incorporating document recite all of the unsigned contract's terms. *See* Va. Code Ann. § 8.2-201(1) ("A writing is not insufficient because it omits . . . a term agreed upon[.]"). At bottom, the 2012 LOU references the USA Core Policy's essential terms—those related to the day-to-day operation of the parties' agreement—and sufficiently assures the Court that there was a contract between the two parties adopting the USA Core Policy. *See id.* The U.C.C. statute of frauds therefore does not bar the admission of the USA Core Policy.

Even if the separate writing provision of the U.C.C. statute of frauds were not enough to render it inapplicable, the merchant exception also does so. Virginia's merchant exception states that if merchants orally agree to a contract and "within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies [the statute of frauds] against such party unless written notice of objection to its contents is given within ten days after it is received." *Id.* § 8.2-201(2). Here, Doria—the USA (and later Remy) executive who negotiated the agreements with Fisher—testified that he negotiated the USA Core Policy, he received the USA Core Policy, and he agreed to it. *See* J.A. 2792 (Q: "[D]o you remember, in fact, receiving [the USA Core Policy] at some point?" Doria: "Yeah." Q: "And agreeing to it?" Doria: "Yes, I do."). Neither Doria nor any other USA representative objected to it or any of its terms. Under these circumstances, the merchant exception

17

applies. Therefore, the U.C.C. statute of frauds would not bar the USA Core Policy's admission for this independent reason.[9]

Remy alternatively asserts that the USA Core Policy violates the general statute of frauds under Va. Code Ann. § 11-2(8). Although there are no enumerated exceptions to that statute of frauds, Virginia courts have applied certain exceptions to it. Similar to the U.C.C. statute of frauds' exception discussed above, Virginia courts have "long held that multiple writings" referencing the essential terms of an oral agreement "may be used to defeat a plea of the statute of frauds." *C. Porter Vaughan, Inc. v. DiLorenzo*, 689 S.E.2d 656, 661 (Va. 2010). Thus, for the same reasons the 2012 LOU's incorporation of the essential terms of the USA Core Policy satisfies the U.C.C. statute of frauds, it similarly precludes the application of the common law statute of frauds.[10]

We therefore conclude that the district court did not abuse its discretion by allowing the USA Core Policy and testimony about it into evidence.

---

[9] We find no merit in Remy's challenge to the reasonable-time-of-receipt element. The evidence was undisputed that USA received the USA Core Policy and acted under it for years. Remy offers no evidence to the contrary.

[10] We also note that because the object of the statute of frauds is to prevent fraud, Virginia courts refuse to apply the common law statute of frauds when doing "so would result in a fraud or perpetrate a wrong." *Troyer v. Troyer*, 341 S.E.2d 182, 185 (Va. 1986); *see also Murphy v. Nolte & Co.*, 307 S.E.2d 242, 245 (Va. 1983). Though we need not rely on this policy exception here, its application is clearly relevant given that all the original parties to the USA Core Policy testified that they negotiated for and agreed to its terms and Remy appears to simply wish to avoid its enforcement in this litigation.

III.

Remy next argues that the district court erroneously granted summary judgment to Fisher on Remy's breach of contract claim related to the ownership of the core inventory and the KOI and Hoffman Agreements.

Fisher moved for summary judgment on this claim, arguing that, under the first material breach doctrine, Remy's failure to keep Fisher competitive precluded Fisher's liability for any money it would owe under the 2015 LOU. Remy responded that it did not breach the Keep Competitive Clause and, even if it did, that Fisher waived a first material breach argument by continuing to place orders with Remy. The district court concluded that "[g]iven Remy's admitted performance issues, including but not limited to order fill rates, Remy breached the contract prior to June 18, 2018, by failing to keep Fisher competitive in the marketplace." *Remy Holdings Int'l*, 2022 WL 571527, at *4. Thus, under the first material breach doctrine, the district court held that "Remy is precluded from proceeding against Fisher for breach of contract." *Id.* In doing so, the district court rejected Remy's waiver argument, reasoning that, in Virginia, continuing to perform after a material breach does not preclude asserting such a defense if the nonbreaching party complained about the breach when it occurred. Accordingly, the court granted Fisher's motion and dismissed Remy's breach of contract claim regarding ownership of the core inventory and the KOI and Hoffman Agreements.

Remy contends that the district court erroneously applied the first material breach defense because Fisher waived such a defense by continuing to order parts from Remy, utilizing the fill-order penalty, and at times explicitly waiving the fill-order penalty.

19

We review the district court's grant of summary judgment de novo. *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 291 (4th Cir. 2021). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted).

In Virginia, a party who commits the first material breach of a contract is generally not entitled to enforce it. *Horton v. Horton*, 487 S.E.2d 200, 203 (Va. 1997). In other words, as a defense to a breach of contract claim, a defending party can assert that the party who brought the claim committed the first material breach and therefore cannot enforce the contract. "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Id.* at 204.

However, the first material breach defense can be waived in certain circumstances during the course of the contract's performance. *Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc.*, 595 S.E.2d 1, 6 (Va. 2004). "Waiver is an intentional relinquishment of a known right." *Id.* (cleaned up). To establish waiver, there must be (1) "knowledge of the facts basic to the exercise of the right and" (2) "the intent to relinquish that right." *Id.* (citation omitted). "The party relying on a waiver has the burden to prove the essentials of such waiver by clear, precise, and unequivocal evidence." *Id.* (cleaned up).

There is no genuine dispute that Remy committed the first material breach. Under the 2015 LOU, Remy was required to "keep[] Fisher competitive in the marketplace in every way." J.A. 136. Remy conceded before the district court that "[t]o keep a customer competitive, Remy needed consistent order-fill rates in the low-to-mid 90s." J.A. 264

20

(Fisher's statement of undisputed material facts); J.A. 1304 (Remy conceding that Fisher's statement of undisputed material facts was "correct"). The record shows that Remy consistently failed to meet that competitive fill rate, averaging an order-fill rate below 80% and sometimes timely filling only 40 or 50% of orders. And Remy does not dispute that its failure to meet this requirement was material. Given that Remy's contractually deficient performance predated Fisher's allegedly wrongful termination of their relationship, Remy committed the first material breach.[11]

The pertinent question therefore is whether Fisher waived its right to assert the first material breach doctrine during the parties' course of dealing by (1) continuing to order from Remy—including by placing at least one large seasonal order—and (2) "absolving" Remy of the fill-rate penalty on at least one occasion. Two Supreme Court of Virginia cases are instructive in answering this question.

In *Horton v. Horton*, the Supreme Court of Virginia determined that a party did not waive the first material breach defense despite continuing the contractual relationship after

---

[11] Remy does assert, however, that the district court erroneously failed to consider the APSG Terms' provision regarding Remy's obligation to keep Fisher competitive when interpreting the 2015 LOU's Keep Competitive Clause. But Remy conceded below that the APSG Terms did not govern the parties' conduct. *See* J.A. 1300–01 ("And I will concede to you, . . . Remy no longer relies on [the APSG Terms'] language and Remy concedes that, because the LOU between Remy and Fisher has different termination language, the language in the LOU would trump."). Moreover, as noted, Remy conceded that it failed to perform as necessary to keep Fisher competitive—with order-fill rates far below the required low-to-mid 90s. *See* J.A. 265, 1304. The district court did not err therefore by failing to consider if the APSG Terms—which were not signed by the parties or otherwise agreed to by Fisher—affected the signed 2015 LOU's terms.

Additionally, Remy asserts that the Keep Competitive Clause is too indefinite to establish an enforceable promise. However, Remy forfeited that argument by failing to raise it below. *See Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020).

21

the breach occurred. 487 S.E.2d at 204. In relevant part, the parties' contract required Mrs. Horton to sign a separate dissolution agreement and execute a power of attorney giving her lawyer the ability to sign on her behalf certain documents necessary to the sale of multiple real estate lots. *Id.* at 202. In return, Mr. Horton agreed to pay Mrs. Horton net proceeds from the anticipated sale of those lots and to supplement the payments with his own funds in certain circumstances. Mrs. Horton signed the dissolution agreement, but failed to execute the power of attorney "despite Mr. Horton's repeated requests" to do so. *Id.* Mrs. Horton instead simply signed the relevant documents herself and ignored Mr. Horton's request before each sale that she execute the power of attorney. Nonetheless, for years, Mr. Horton complied with his end of the agreement, paying Mrs. Horton the proceeds from the sales and supplementing those payments when necessary. *Id.* at 203. Eventually, however, Mrs. Horton began withholding her signature, which resulted in delays—and sometimes the complete loss—of settlements, causing harm to Mr. Horton. He ceased his payments to her as a result. *Id.*

Mrs. Horton then sued for breach of contract. Mr. Horton countered that Mrs. Horton could not bring such a claim because she committed the first material breach by failing to execute a power of attorney. Mrs. Horton responded that by proceeding with the payments and accepting her signatures instead of a power of attorney, Mr. Horton had waived the requirement that Mrs. Horton execute a power of attorney. *Id.* The court rejected Mrs. Horton's argument, reasoning that "the evidence affirmatively showed that Mr. Horton did not intend to relinquish his contractual right to secure a power of attorney from Mrs. Horton." *Id.* at 205. For example, "before each settlement, Mr. Horton requested that

22

Mrs. Horton sign the power of attorney as required by the [parties'] contract. These repeated requests establish that Mr. Horton did not waive his right to assert Mrs. Horton's failure to sign the power of attorney as an excuse for his nonperformance." *Id. Horton* therefore provides that a party can continue a contractual relationship after a breach without waiving the first material breach defense where he or she continues to request that the breaching party comply with the contract's terms.

The second relevant case is *Virginia Polytechnic Institute & State University v. Interactive Return Services, Inc.*, where the Supreme Court of Virginia determined that a party could waive a first material breach defense by agreeing to amend the terms of the contract. 595 S.E.2d at 6–7. There, Interactive Return Services ("IRS") agreed to "promptly" reimburse Virginia Tech every month for 80% of the costs of the research and development of a particular device. *Id.* at 3. From the outset, IRS informed Virginia Tech that its income sources were limited. And at some point during the contractual period, IRS stopped reimbursing Virginia Tech. *Id.* Virginia Tech sent several letters demanding payment, but IRS stated that it could not pay and instead offered to work out a payment schedule. Later, IRS informed Virginia Tech that it could not make any further payments until it received the finished device. *Id.* Nevertheless, Virginia Tech continued its research and even requested several extensions and additional research costs toward developing the device.

When Virginia Tech eventually stopped working on the project, IRS filed a breach of contract claim. Virginia Tech responded that IRS could not enforce the contract because IRS committed the first material breach by failing to promptly reimburse Virginia Tech. In

23

reply, IRS alleged that Virginia Tech had waived that argument by modifying the terms of their agreement and explicitly agreeing to give IRS until after the device was developed to reimburse Virginia Tech. The court concluded that there was sufficient evidence "consistent with IRS's position that Virginia Tech had agreed to wait for payment until . . . after it provided a working prototype to IRS," such that a jury should resolve the issue. *Id.* at 6. It relied on the fact that IRS timely disclosed financial deficiencies and that Virginia Tech continued to work on the project—even requesting additional costs—after IRS informed it that it could not make further payments until IRS received the device. As a result, the case was not one "in which Virginia Tech merely acquiesced in IRS's failure to pay its indebtedness promptly. Instead, there is sufficient evidence from which the jury could fairly infer that Virginia Tech intended to relinquish its contractual right to receive prompt payment by IRS in order to produce [the device]." *Id.* at 7 (citation omitted). *Virginia Polytechnic* therefore suggests that a party can waive a first material breach defense by explicitly amending the relevant contractual term.

Remy contends that this case is more analogous to *Virginia Polytechnic* because Fisher explicitly "absolved" Remy of its order-fill penalty on at least one occasion and Fisher was aware of Remy's poor performance but continued to order from Remy and even requested larger orders. We disagree with Remy.

Unlike in *Virginia Polytechnic*—where IRS alleged Virginia Tech agreed to amend their agreement and accept a later payment—there is no allegation that Fisher ever abrogated Remy's contractual obligation to keep it competitive through certain fill rates. To the contrary, Remy concedes that "Fisher routinely demanded that Remy meet order fill

24

at a certain percentage, [and] complained when that did not occur." Opening Br. 44.

Moreover, consistent with a desire to enforce its contractual right, Fisher repeatedly

invoked the 5% order-fill penalty, requiring Remy to discount the parts that Remy failed

to timely provide to Fisher.[12] That puts this case more in line with *Horton* than *Virginia*

*Polytechnic*. Fisher's repeated requests and asserted penalties are convincing direct

evidence that it intended to invoke its right to demand that Remy keep it competitive. It is

not enough that Fisher simply continued to order from Remy consistent with their

agreements when Fisher so clearly intended to invoke its contract right—"[a]cceptance of

defective performance, without more, does not prove intent to relinquish the right to full

performance." *Horton*, 487 S.E.2d at 204.[13]

---

[12] To the extent Remy suggests that Fisher's invocation of the order-fill penalty was itself a waiver of its right to claim a breach of contract, that argument is without merit. Under Virginia law, a remedy is "exclusive of other possible remedies only where the language employed in the contract clearly shows an intent that the remedy be exclusive." *Bender-Miller Co. v. Thomwood Farms, Inc.*, 179 S.E.2d 636 (Va. 1971). And nothing suggests the order-fill penalty was an exclusive remedy.

[13] To support its position, Remy also points the Court to *Richmond Leather Manufacturing Co. v. Fawcett*, where the Supreme Court of Virginia concluded that "[a] series of dealings in which delayed deliveries are accepted and paid for, and further deliveries demanded, justifies the party in default, in the absence of anything to the contrary, in concluding that the contract will not be rescinded on account of such delayed deliveries without notice." 107 S.E. 800, 808 (Va. 1921). The court further provided that "[i]f failure to deliver according to the terms of a contract, gives the right to rescind, acceptance of a delayed delivery and payment therefor, standing alone, is a waiver of the right and an election to hold the defaulting party to his contract." *Id.* Remy asserts that *Richmond Leather* therefore suggests that Fisher waived its right to enforce the contract by accepting Remy's deficient performance and submitting further orders.

There are two problems with Remy's argument. To start, it's somewhat unlikely that those statements that Remy cites are still good law, as the Virginia Supreme Court has since significantly changed course. *See, e.g., Stanley's Cafeteria, Inc. v. Abramson*, 306 (Continued)

25

Despite Remy's contentions to the contrary, Fisher never absolved Remy of its contractual duty to keep Fisher competitive through certain order-fill rates. True, Gregory Haan, a corporate adviser at Fisher, stated in his deposition that "from time to time [Fisher] absolved [Remy] from order fill penalties." J.A. 3001.[14] But the fact that Fisher may have absolved Remy of the order-fill *penalty* on specific occasions is not the same thing as absolving Remy of the *underlying contractual obligation* to meet the required order-fill rate. This vague absolution testimony simply does not amount to a waiver of Fisher's contractual right to receive competitive order-fill rates or otherwise make this case more like *Virginia Polytechnic*. At most, there were isolated one-off orders in which Fisher waived the discount, but for that order only.

---

S.E.2d 870, 873 (Va. 1983) ("[S]tanding alone, an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish a right to enforce full performance."); *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09cv863, 2009 WL 4067717, at *4 (E.D. Va. Nov. 23, 2009) (unpublished) (stating that Virginia's more recent waiver decisions "implicitly abrogate, if not overrule" its older decisions). In addition, even if that were the law in Virginia, Remy ignores a key aspect of the Virginia Supreme Court's statements in *Richmond Leather*. The court stated only that the acceptance of deficient performance and further dealings constitute a waiver "*in the absence of anything to the contrary*." *Richmond Leather*, 107 S.E. at 808 (emphasis added); *id.* (stating that acceptance of an inadequate delivery "*standing alone*" amounts to a waiver (emphasis added)). However, here, Fisher did not simply accept Remy's insufficient performance and order more parts. To the contrary, Fisher repeatedly objected to and complained about Remy's failure to meet its contractual obligations. *Richmond Leather* therefore does not help Remy.

[14] Notably, this statement was made in reference to an email in which a Remy employee stated that "Fisher has never held Remy to the same order fill standards for [large seasonal orders] as they have for normal stock orders." J.A. 9830. Haan's response to that email was: "We can certainly discuss this. . . . I don't think Remy can absolve from order fill penalties entirely." J.A. 9830.

At bottom, like in *Horton*, although Fisher continued performing under the parties' agreement, Fisher repeatedly complained about Remy's failure to meet its order-fill rates and—going a step further than Mr. Horton—even penalized Remy for its failure to do so. This consistent and repeated objection to Remy's subpar performance conclusively demonstrates Fisher's intention to enforce its right to competitive order-fill rates. *See Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983) ("The focus of the waiver inquiry is upon intent to relinquish."). Therefore, the district court properly concluded that Fisher did not waive its first material breach defense.[15] And because, as discussed above, Remy indisputably committed the first material breach, the district court properly granted summary judgment to Fisher on Remy's breach of contract claim relating to the core inventory and the KOI and Hoffman Agreements.

IV.

Remy also argues that the district court erred by not reinstating Remy's unjust enrichment claim—seeking a "disgorgement of the benefit conferred upon Fisher by virtue of its non-payment on core balances," J.A. 113—after declaring its contractual rights legally unenforceable.

---

[15] Remy additionally argued—with little explanation—that the district court's "flawed application of Fisher's first material breach defense" resulted in an error related specifically to the KOI and Hoffman Agreements. Opening Br. 49. But given that we find no error with the district court's first material breach analysis, Remy's assertion is without merit.

27

However, Remy's argument fails because it wholly neglected to respond to Fisher's summary judgment motion seeking the dismissal of the unjust enrichment claim and, consequently, forfeited any opposition to its dismissal. *See Williams v. Pro. Transp. Inc.,* 294 F.3d 607, 614 (4th Cir. 2002) ("Issues raised for the first time on appeal are generally not considered absent exceptional circumstances."); *Hadeed v. Abraham*, 103 F. App'x 706, 708 (4th Cir. 2004) (per curiam) (stating the nonmoving parties waived an issue on appeal by failing to oppose the moving party's motion before the district court). We therefore discern no error in the district court's failure to subsequently reinstate Remy's unjust enrichment claim.

## V.

Remy next asserts that the district court erroneously allowed testimony from Fisher's expert, Peter Kornafel, into evidence at trial.

Federal Rule of Evidence 704(a) allows the admission of expert testimony that "embraces an ultimate issue" to be decided by the trier of fact. "However, opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." *United States v. McIver*, 470 F.3d 550, 561–62 (4th Cir. 2006).

Kornafel is an expert "in the automotive aftermarket with respect to core-related programs and practices, automotive buying groups, and inventory management." J.A. 3025. He was designated to testify regarding core programs. In his deposition, Kornafel stated in relevant part, "I'm not here to give you a legal opinion about who owns the cores,

28

one way or the other. But I think that [the USA Core Policy] is pretty straightforward in what it says, that at the conclusion of the deal that was outlined in that program, it says, quote, Fisher would own those cores." J.A. 7271. He also stated that the program "was followed from 2005 to the end of the relationship, even by Remy. So while that document isn't signed, I believe that it was, in fact, how they did business with each other for more than 10 years." J.A. 7273. Based on those statements, Remy challenged the admission of Kornafel's testimony as giving improper legal conclusions. The court rejected that argument because "Kornafel bases his opinions on industry-specific experience, not an interpretation of the parties' contracts" but noted that it "may revisit this ruling at trial if Kornafel's testimony crosses the line into contract interpretation." *Remy Holdings Int'l*, 2022 WL 193742, at *15.

At trial, Kornafel testified that group term sheets—such as the APSG Terms—are offers made "available to any member of the group, but [they] do[] not create any obligations on any part of the members of the group." J.A. 3024. Instead, the "important document in every case would be a contract between the individual member and the [manufacturer]." J.A. 3024. Kornafel also stated that ownership of the core is "[e]ntirely unrelated" to the kind of program the contracting parties employ. J.A. 3028. Importantly, Kornafel did not give an opinion on who owned the cores on direct examination. However, on cross examination, Remy's attorney asked Kornafel how he arrived at his "opinion that Fisher owned the Remy cores." J.A. 3052. Kornafel responded that his "opinion was based

29

on the fact that there is no contract that says Remy owns those cores." J.A. 3052. Remy did not object to Kornafel's testimony during trial.[16]

We review the district court's decision to admit expert testimony into evidence for abuse of discretion. *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005). "A district court abuses its discretion if its conclusion is guided by erroneous legal principles, or if it rests upon a clearly erroneous factual finding." *Id.*

Remy asserts the district court abused its discretion by allowing the jury to hear Kornafel's testimony that interpreted the parties' contractual rights and opined on who owned the cores. But none of Kornafel's direct examination testimony involved the allegedly improper legal conclusions. He merely testified about general practices between buying groups and manufacturers and typical core ownership agreements. *See Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 55 (1st Cir. 2006) ("[I]n general, the customs and practices of an industry are proper subjects for expert testimony."). It was not until Remy's own counsel brought up Kornafel's opinion on core ownership that Kornafel explained why he believed Fisher owned the core. Given that Remy "invited" the allegedly erroneously admitted testimony by introducing the issue in a question that elicited the response it now complains of, this testimony provides "no basis for reversal." *United States*

---

[16] Fisher contends that because Remy failed to object at trial, its argument is reviewed for plain error. That is incorrect. "Motions in limine 'preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it.'" *Rice v. Comty. Health Ass'n*, 203 F.3d 283, 286 (4th Cir. 2000) (citation omitted).

*v. Neal*, 78 F.3d 901, 904 (4th Cir. 1996) (citing the invited-error doctrine to find no error where the objecting attorney elicited most of the statements he later challenged on appeal).

## VI.

Finally, Remy argues that the district court erroneously declined to instruct the jury on waiver, laches, and estoppel as defenses to Fisher's breach of contract claim relating to Remy's failure to keep Fisher competitive.[17]

The Court reviews "the decision to give or not give a jury instruction . . . for abuse of discretion." *Snoeyenbos v. Curtis*, 60 F.4th 723, 729 (4th Cir. 2023). "A district court will be reversed for declining to give an instruction proposed by a party only when the requested instruction '(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired' that party's ability to make its case." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (citation omitted).

Remy asserts that the district court should have instructed the jury on waiver, laches, and estoppel as defenses to Fisher's breach of contract claim because Fisher invoked contract penalties, submitted new orders, and continued to accumulate lost profit damages after Remy allegedly breached the parties' contract. However, prior to trial the district court determined that Remy was liable for the breach of contract claim and explicitly rejected Remy's waiver argument. All that was left for trial was a determination of damages. Remy

---

[17] The district court's decision not to give Remy's requested jury instructions is not in the record.

provides no support for its contention that the equitable defenses of waiver, laches, and estoppel can be used as defenses to *damages* as opposed to *liability*. Therefore, Remy failed to meet its "heavy burden" showing that the district court abused its discretion by failing to so instruct the jury. *Id.*

## VII.

Because we find no error in its decisions, the district court's judgment is

*AFFIRMED*.